IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN RE COLUMBIA PIPELINE
GROUP, INC. MERGER
LITIGATION

§
§ No. 281, 2024
§
§ Court Below–Court of Chancery
§ of the State of Delaware
§
§ C.A. No. 2018-0484

Submitted: March 12, 2025
Decided: June 17, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW** and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **REVERSED.**

David E. Ross, Esquire, S. Michael Sirkin, Esquire, Roger S. Stronach, Esquire; Thomas A. Barr, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; James M. Yoch, Jr., Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Massengill, Esquire, Matthew C. Sostrin, Esquire, MAYER BROWN LLP, Chicago, Illinois; Nicole A. Saharsky, Esquire (*argued*), Minh Nguyen-Dang, Esquire, Carmen N. Longoria-Green, Esquire, MAYER BROWN LLP, Washington, DC, *for Defendant Below/Appellant TC Energy Corp.*

Gregory V. Varallo, Esquire (*argued*), BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Ned Weinberger, Esquire; Brendan W. Sullivan, Esquire, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Stephen E. Jenkins, Esquire; Marie M. Degnan, Esquire, ASHBY & GEDDES, P.A., Wilmington, Delaware, Jeroen van Kwawegen, Esquire; Christopher J. Orrico, Esquire, Thomas G. James, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, *for Co-Lead Plaintiffs Below/Appellees.*

**TRAYNOR**, Justice:

A Canadian energy company acquired a Delaware corporation in a merger that resulted in lucrative change-in-control payments to three of the acquired corporation's C-suite officers. Two of those officers negotiated the transaction on behalf of the corporation. Stockholders of the acquired corporation sued, alleging that the officers and the corporation's board of directors breached their fiduciary duties during the sale process. In particular, the operative complaint alleged that the officers initiated and timed the merger in a way that favored their own self-interest at an inopportune time for the corporation's stockholders. This, the plaintiffs alleged, deprived the corporation's stockholders of a value-maximizing transaction. The stockholder plaintiffs alleged further that the officers breached their duty of disclosure when they issued a misleading proxy statement. But most relevant to the issues we must decide in this appeal is the plaintiffs' claim that the acquiror aided and abetted the officers' breaches, as well as exculpated breaches of the duty of care by the corporation's board.

On a mountainous trial record, the Court of Chancery found that the plaintiffs had proved their aiding-and-abetting claims—that is, they had proved not only the underlying breaches of fiduciary duty but also that the acquiror constructively knew of, and culpably participated in, the breaches. The court then assessed damages, entering a judgment of approximately $200 million against the acquirors.

2

For the reasons set forth below, we reverse the Court of Chancery's judgment. In our recent decision in *In re Mindbody, Inc., Stockholder Litigation*,[1] which we issued after the Court of Chancery decided this case, we held that for an acquiror to be held liable for aiding and abetting a sell-side breach of fiduciary duty, the acquiror must have actual knowledge of both the target's breach and the wrongfulness of its own conduct. For understandable reasons, that standard was not applied here. And our independent review of the record, which includes a deferential consideration of the trial court's findings, leads us to conclude that the standard was not met.

I

The Court of Chancery made extensive factual findings following a five-day trial at which 15 fact witnesses and four expert witnesses testified and 1,928 exhibits, including deposition transcripts from 29 individuals, were introduced. And before that, the parties had submitted a pretrial stipulation, which included over 180 pages of undisputed facts. The court also relied on factual findings made in a related appraisal action that concerned the same transaction[2]—findings that are binding on TC Energy Corp. ("TransCanada") in this case via collateral estoppel. Of the court's detailed findings and the parties' stipulated facts, we endeavor here to summarize

---

[1] 332 A.3d 349 (Del. 2024).
[2] *In re Appraisal of Columbia Pipeline Grp., Inc.*, 2019 WL 3778370 (Del. Ch. Aug. 12, 2019) [hereinafter "*Appraisal Decision*"].

3

those most relevant to our analysis.  Still, our account is lengthy, and thus we beg the reader's indulgence in advance.

A

Until July 2015, Columbia Pipeline Group, Inc. ("Columbia") was a wholly owned subsidiary of NiSource, Inc., a publicly traded utility.  Columbia owned and operated natural gas pipelines, storage facilities, and other "midstream" assets necessary to transport natural gas.  Robert Skaggs Jr. served as NiSource's chief executive officer and chair of its board of directors.  Stephen Smith was NiSource's chief financial officer, and Glenn Kettering served as the Columbia business unit's chief executive officer.  The facts surrounding Columbia's spinoff from NiSource as found by the Court of Chancery—and in particular the roles and motivations of Skaggs, Smith and, to a lesser extent, Kettering—are worth recounting here as they are relevant to the process by which the spun-off entity was eventually sold to TransCanada.

i

As of 2014, Skaggs, Smith, and Kettering were, in the Court of Chancery's words, "aging executives"[3] and, as such, had their eyes on retirement.  The year 2016 was an apt target year for retirement for all three.  And although all three had

---

[3] *In re Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d 393, 410 (Del. Ch. 2023) [hereinafter "*Liability Decision*"].

4

lucrative change-in-control agreements with NiSource under which a sale of the company would trigger the vesting of their unvested equity, a sale of Columbia would not qualify as a change in control.[4] But if Columbia were to be spun off from NiSource and if Skaggs, Smith, and Kettering were to join the new entity with change-in-control agreements comparable to those they had with NiSource, the three executives could reap their benefits and retire upon a sale of the new entity. And that is the course they charted.

In September 2014, upon Skaggs's recommendation, NiSource announced its intention to spin-off Columbia. Three months later, the NiSource board approved Skaggs, Smith, and Kettering's request to join Columbia. Each received a change-in-control agreement comparable to their agreements with NiSource. Smith's and Kettering's new change-in-control agreements—thanks to Skaggs—also increased the amount they would receive if they were no longer employed following a change in control from two times their annual salaries and bonuses to three times their annual salaries and bonuses.[5] Notably, their agreements were to expire in 2018.

Skaggs, Smith, and Kettering anticipated that Columbia would become an acquisition target and, accordingly, readied themselves to address inbound inquiries.

---

[4] Each change-in-control agreement provided that the change-in-control benefits would vest upon a transfer of at least "50% of the aggregate book value of assets of NiSource and its Affiliates." App. to Opening Br. at A173, A176, A181. Before the spinoff, Columbia comprised less than 50% of the aggregate book value of assets held by NiSource.

[5] Under both his NiSource and Columbia change-in-control agreements, Skaggs would receive a payment equal to three times his annual salary and bonus. *Id.* at A173–74.

These preparations included the retention of Lazard Frères & Co. and Goldman, Sachs & Co. to provide financial advice. Lazard identified potential acquirors before the spinoff was completed, placing them in four tiers according to their ability to pay and likelihood of interest. One such firm was TransCanada, a Canadian conglomerate that owns and operates a network of oil and gas pipelines, as well as a number of nuclear and gas-fired power plants, across North America. Lazard situated two potential acquirors—Kinder Morgan, Inc. and Energy Transfer Equity L.P.—in the first tier; TransCanada occupied the second tier with Berkshire Hathaway Energy, Dominion Resources, Inc., Spectra Energy Corp., NextEra Energy, Enbridge, Inc., and The Williams Companies.

In May 2015, Lazard contacted TransCanada, disclosing that Columbia "might be put into play" and that "social issues may not be a significant consideration."[6] Lazard was signaling to TransCanada, via this message, that Skaggs, Smith, and Kettering all intended to retire with their change-in-control benefits at the conclusion of any future transaction.

With the completion of the spinoff on July 1, 2015, Columbia became an independent, publicly traded company. Its board consisted of Skaggs and six independent outside directors. Sigmund Cornelius, an oil-and-gas industry veteran,

---

[6] *Liability Decision*, 299 A.3d at 412.

was the board's lead outside director. Each of the other directors had significant business experience and were unsaddled by any relevant conflicts of interest.

B

TransCanada began assessing the possibility of acquiring Columbia soon after the spinoff was completed. François Poirier, TransCanada's Senior Vice President for Strategy and Corporate Development—described by the Court of Chancery as "a savvy former investment banker and repeat player in the M&A game"[7]—took the lead for TransCanada. Wells Fargo Securities, LLC served as TransCanada's investment banker.

Two potential acquirors, Spectra and Dominion, had already reached out to Skaggs to discuss the possibility of a transaction when TransCanada began its pursuit of Columbia. Unlike those firms, TransCanada approached Smith instead of Skaggs. Poirier had known Smith since 1999, when Smith was the Treasurer of American Electric Power, Inc. and Poirier was an investment banker at JP Morgan Chase & Co. Poirier had met with Smith "approximately a dozen times per year" between 1999 and 2007, and the pair remained in touch after Smith joined NiSource.[8]

The Court of Chancery found TransCanada's decision to approach Smith instead of Skaggs to be tactical. In the court's words, Smith was "an experienced

---

[7] *Id.* at 405.
[8] *Id.* at 413.

CFO"[9] who was "detail-oriented and a team player[,]" but his collaborative nature meant that he was also "fully transparent" and "lack[ed] guile or artifice."[10] Smith "shared information freely[,]" "ha[d] no poker face[,]" and was an "M&A neophyte."[11] This made Smith, according to the court, "a compliant informant" for Poirier.[12]

Eric Fornell, Wells Fargo's lead investment banker on the TransCanada team, visited Smith three times in September and October 2015. At these meetings, Fornell told Smith that TransCanada was interested in acquiring Columbia, and he eventually facilitated a call between Smith and Poirier in early October. After the October call, Poirier assembled his team to develop an analysis of a potential acquisition of Columbia. Poirier's analysis described Columbia as "[c]urrently for sale."[13] The Court of Chancery found that Smith was the source of this information. The analysis also characterized Columbia's management as "individuals who were seen as 'ineffective' at NiSource"[14] and calculated the value of any change-in-control payments that Skaggs, Smith, and Kettering would receive at the conclusion

---

[9] *Id.* at 405.
[10] *Id.* at 414.
[11] *Id.* at 405.
[12] *Id.*
[13] App. to Opening Br. at A206.
[14] *Liability Decision*, 299 A.3d at 413.

of any contemplated transaction. At no point did TransCanada consider retaining Skaggs, Smith, or Kettering.[15]

C

Energy markets deteriorated throughout the second half of 2015. In October, Skaggs sent a memorandum to the Columbia board, noting that, to support Columbia's growth and maintain its investment grade credit ratings, the company would need to "issue between $3 billion and $4 billion of equity . . . over the next three years[,]" one billion of which needed to be issued by early 2016.[16] This was not an easy task. Columbia's key vehicle for raising capital was Columbia Pipeline Partners LP ("CPPL"), a master limited partnership formed in advance of the spinoff and controlled by Columbia.[17] CPPL would occasionally issue equity and use the proceeds to purchase Columbia assets via drop-down transactions. By the fall of 2015, however, CPPL's unit price had declined substantially following its initial public offering earlier that year, undercutting CPPL's capacity to raise capital for Columbia.[18]

---

[15] App. to Answering Br. at B178 (Poirier Trial Testimony) ("Q. . . . [T]here was never a consideration of keeping on Mr. Smith or Mr. Skaggs following the transaction; right? A. No. . . ."). Nor did any of TransCanada's synergies analyses contemplate keeping Skaggs, Smith, or Kettering as part of Columbia's management. *Id.* at B181.

[16] App. to Opening Br. at A206–07.

[17] *See id.* at A192.

[18] Columbia had "originally assumed . . . that CPPL would be [its] primary and most efficient equity raising vehicle." *Id.* at A207. By October 2015, that assumption no longer held. *Id.*

Because CPPL equity issuances would be insufficient to meet Columbia's capital needs, Skaggs proposed a "two-track strategy."[19] Under this plan, on one track, Columbia would pursue a near-term equity offering of "~$1.0+ billion" in Columbia stock.[20] On the other track, Columbia would "[e]xplore whether . . . a select group of blue chip strategic players[,]" including TransCanada, "would have a legitimate interest in [Columbia] - - at a price that's within [Columbia]'s intrinsic value range."[21] The Columbia board approved the two-track strategy at its October meeting.

With the Columbia board's blessing, Skaggs contacted Dominion's CEO on October 26. He explained that Columbia would be pursuing an equity offering, and that, if Dominion had interest in completing a deal, it should move quickly. Meanwhile, at a dinner meeting later that evening, Poirier expressed to Smith TransCanada's interest in acquiring Columbia. Smith relayed TransCanada's expression of interest to Columbia's management.

Later that week, the Columbia board heard updates from Skaggs and Smith concerning their discussions with Dominion and TransCanada, respectively. At this meeting, the board set the stage for a sale process beginning in November 2015. The board, perceiving that Dominion was more likely to make an acceptable offer,

---

[19] *Liability Decision*, 299 A.3d at 414; *Appraisal Decision*, 2019 WL 3778370, at *6.
[20] App. to Opening Br. at A209.
[21] *Id.*

instructed management to pursue a deal with Dominion, but permitted management to engage with TransCanada if Dominion failed to make an attractive offer. The board decided further that Columbia would pursue an equity offering unless it could find an acquiror willing to pay at least $28 per share.

## D

In keeping with the two-track strategy, Columbia management and its advisors ran a sale process spanning most of November 2015. Three circumstances surrounding this sale process are of particular moment in this appeal. First, Columbia executed NDAs with TransCanada and other potential buyers containing "don't-ask-don't-waive" standstills. Second, despite receiving two offers, Columbia refused to sell at a price it viewed as inadequate. Third, at the conclusion of the November sale process, Poirier used his relationship with Smith to obtain information about the possibility of future discussions concerning a sale, likely in violation of the standstill agreement between Columbia and TransCanada. We turn next to an expanded discussion of these circumstances.

## i

Skaggs met with Dominion's CEO again on November 2, 2015, and offered exclusivity in exchange for a cash deal at $28 per share. Dominion indicated that this was not feasible; instead, Dominion suggested either a three-way merger-of-

equals consisting of an all-stock agreement between Dominion, Columbia, and NextEra, or an equity investment in some Columbia subsidiaries and joint ventures.

Over the next week, Columbia began preparations for the provision of nonpublic information to interested buyers. On November 6, Smith contacted Poirier and offered to enter into an NDA and provide nonpublic information to TransCanada. Three days later, on November 9, Columbia and TransCanada executed an NDA containing a "don't-ask-don't waive" standstill provision (the "Standstill"). Specifically, the Standstill read:

> Standstill. In consideration for being furnished with Evaluation Material by the other Party, each Party (each such party in such context, the "Standstill Party") agrees that until the date that is twelve months after the date of this Agreement, unless the other Party's board of directors otherwise so specifically requests in writing in advance, the Standstill Party shall not, and shall cause its Representatives not to . . . directly or indirectly,
>
> (A) acquire or offer to acquire, or seek, propose or agree to acquire, by means of a purchase, tender or exchange offer, business combination or in any other manner, beneficial ownership . . . or constructive economic ownership . . . of the other Party . . .
>
> (B) seek or propose to influence, advise, change or control the management, board of directors, governing instruments or policies or affairs of the other Party, including by means of . . . contacting any person relating to any of the matters set forth in this Agreement . . . or making a request to amend or waive this provision . . . or

(C) make any public disclosure, or take any action that could require the other Party to make any public disclosure, with respect to any of the matters that are the subject of this Agreement.[22]

The NDA was negotiated on TransCanada's behalf by its Vice President of Law and Corporate Secretary, Christine Johnston. Johnston negotiated the length of the Standstill down from 18 months, as initially suggested by Columbia, to 12 months. The Court of Chancery found that this fact demonstrated that "TransCanada focused on the [Standstill] provision."[23] The topic of the Standstill also came up at a meeting of the TransCanada deal team the day after the NDA was executed. Fornell's handwritten meeting notes state: "standstill → 12 months can't make run at them."[24] Poirier also confirmed at trial that the Standstill had been discussed at this meeting and agreed that he "understood . . . that TransCanada could not pursue a potential transaction with Columbia Pipeline without receiving a written invitation from the Columbia Pipeline board."[25]

Columbia also executed NDAs with NextEra and Dominion and gave them permission to share information with each other to evaluate the feasibility of the three-way merger suggested by Dominion's CEO. On behalf of Columbia, Goldman also invited Berkshire to participate in the sale process. Columbia and Berkshire

---

[22] *Id.* at A827–28.
[23] *Liability Decision*, 299 A.3d at 415.
[24] App. to Answering Br. at B1.
[25] *Id.* at B195–97.

subsequently executed an NDA. These agreements contained 18-month "don't-ask-don't waive" standstills that were "functionally identical" to the TransCanada NDA.[26]

Columbia's board was not informed of the standstills. Lead outside director Cornelius heard the term "don't-ask-don't-waive" for the first time during this litigation.[27]

ii

Throughout November, Columbia provided diligence materials to Dominion, NextEra, TransCanada, and Berkshire. The interested bidders also received management presentations. TransCanada received a presentation from Smith and Kettering on November 13, 2015.

Despite inbound interest in an acquisition, Columbia was not wed to the prospect of a sale in the near term. In a memorandum to the Columbia board, Skaggs provided an update on the two-track strategy. He wrote that Columbia had "engaged in interesting exploratory discussions with three of the four credible inbound strategic players (Dominion, TransCanada, Spectra, and Berkshire Hathaway)."[28] He also stated that the sale process was "in the early stages and has not yet generated a solid (credible) proposition that warrants delaying our Track 1 effort.

---

[26] App. to Opening Br. at A220.
[27] *Liability Decision*, 299 A.3d at 415.
[28] App. to Opening Br. at A219 (internal quotation marks omitted).

Consequently, we are preparing to launch the [Columbia] equity raise during the week of November 30—subject to your endorsement."[29]  Columbia's board met on November 17.  At this meeting, Skaggs presented the same update on the two-track strategy that he had outlined in his memorandum.  The board endorsed his approach.

Because Berkshire and TransCanada appeared more willing to provide the all-cash offer that Columbia management was seeking, management guided the November sale process toward those prospects.  After the Columbia board meeting, Skaggs contacted Berkshire and invited a bid by November 24.  Skaggs and Smith also invited TransCanada to bid by the November 24 deadline.  They urged TransCanada to "focus on three criteria:  an all-cash transaction, closing certainty, and price."[30]  Both potential acquirors were told that Columbia planned to proceed with an equity offering if no suitable offer was received.

Poirier updated the TransCanada board of directors on November 19 and 20.  Poirier informed the TransCanada board that "[Columbia] management appears to prefer a sale of the company and ha[s] indicated to us that there will be no social issues."[31]  Poirier's team also explained the financial value of Skaggs's, Smith's, and Kettering's change-in-control benefits were Columbia to accept a bid at a 20% premium to its stock price in November 2015.  TransCanada was aware that the large

---

[29] *Id.*
[30] *Liability Decision*, 299 A.3d at 415–16.
[31] *Id.* at 416 (quoting JTX 337 at 5).

change-in-control agreements meant that Columbia management was "motivated to sell."[32] Outside the board meeting, Poirier also mentioned to senior management at TransCanada that, because of Columbia's capital needs and desire to avoid future equity issuances, its management "cannot afford for a sale process to fail in the near term."[33]

Columbia ultimately received offers from both Berkshire and TransCanada by the November 24 deadline, but both were below the $28-per-share target set by the Columbia board. Berkshire proposed an acquisition at $23.50 per share and TransCanada offered an all-cash deal at $25 to $26 per share. Skaggs relayed these offers to the board, along with the message that Dominion and NextEra had not submitted bids.[34] At a board meeting the next day, the Columbia board rejected both indicative offers as "too low to pursue" and, concerned about the risk of undermining the effectiveness of an equity offering by waiting too long, instructed management to conclude the sale process and proceed with an equity offering.[35]

Skaggs called Russ Girling, TransCanada's CEO, after the Columbia board meeting to update him on the board's decision. Girling asked what would happen if TransCanada was able to "close the gap between $26 and $28 . . . and get it done by

---

[32] *Id.* (quoting JTX 306 at 1).

[33] *Id.* (quoting JTX 371 at 3–4).

[34] The Court of Chancery considered this statement misleading in light of the fact that neither Dominion nor NextEra had been given notice of the November 24 deadline and thus had no indication that they needed to act. *Id.*

[35] *Id.*

Christmas."[36] Skaggs responded that the Columbia board did not want to take that risk and reaffirmed Columbia's intention to pursue an equity offering the week of November 30. Skaggs had a similar conversation with Berkshire, which had previously informed Goldman that a decision to proceed with an equity offering by Columbia would "kill our conversation."[37] That day, Columbia also sent "pencils down" letters to Dominion, NextEra, Berkshire and TransCanada and requested that nonpublic information provided to each potential acquiror under the NDAs be returned to Columbia or destroyed. The letters came as a surprise to Dominion and NextEra, neither of which had been informed of the November 24 deadline. As NextEra put it, "[t]his was news to us."[38]

iii

Girling passed Skaggs's message along to the TransCanada deal team, and Poirier called Smith for "additional color."[39] During this call, Smith told Poirier that Columbia's management would likely want to resume merger talks "in a few months."[40] Assuming that TransCanada would prefer to complete an acquisition before any additional drop-down transactions or equity offerings, Smith added that Columbia's "planned window for the next drop-down would be in the March to June

---

[36] App. to Opening Br. at A229.
[37] *Id.* at A230.
[38] *Id.* at A229.
[39] *Liability Decision*, 299 A.3d at 417.
[40] *Id.* (quoting JTX 392).

timeframe."[41]  Columbia's board did not authorize Smith to share this information, and Smith did not provide it to any other bidders.

The Court of Chancery concluded that this conversation breached the Standstill.  The court found that Smith was "happy" to backchannel with Poirier and that this call "was one of many occasions when Poirier would extract information from Smith and attempt to draw inferences from his words and body language."[42]  The court added that "[w]hether communicating consciously or subconsciously, Smith gave Poirier lots of signals."[43]  But, importantly, the court also noted that "Poirier did not always read [those signals] correctly."[44]  Nor did Poirier know whether Smith had provided this information to other bidders; in fact, the court found that TransCanada "suspected that other potential bidders could have engaged, and it was possible that Smith or other representatives had given similar messages to other bidders."[45]  Nor does the record show that Poirier—or any other member of the TransCanada deal team—knew that Smith was acting outside the mandate given to Columbia's management by the Columbia board.

Poirier reported the content of his call with Smith to the TransCanada deal team.  He suggested "reengaging in January, with an eye to concluding an agreement

---

[41] *Id.* (quoting JTX 409 at 2).
[42] *Id.* at 418.
[43] *Id.*
[44] *Id.*
[45] *Id.*

by March[,]"[46] before Columbia undertook its next drop-down transaction. The plan was for Poirier to reach out to Smith following the equity issuance and for Girling to call Skaggs before the end of the year. Poirier also suggested that there might be a disconnect between the Columbia board and Columbia management's appetite to sell, the board not being wed to a sale while management had "enthusiasm" for a deal.[47]

Columbia announced its equity offering after market close on December 1, 2015. The offering was oversubscribed, with Columbia taking advantage of high demand to sell over 20 million more shares than initially planned and its underwriters exercising their full option to purchase over 10 million shares. At its completion on December 7, the proceeds from the equity offering totaled "approximately $1.4 billion."[48]

E

TransCanada, following Poirier's suggestion, reached out to Columbia after the announcement of the equity offering, leading to a number of calls and meetings between Columbia management and the TransCanada deal team in December and January 2016. These conversations, all of which the Court of Chancery found to be

---

[46] *Id.* (quoting JTX 411 at 3).
[47] *Id.* (quoting JTX 409 at 2; *Appraisal Decision*, 2019 WL 3778370, at *8).
[48] App. to Opening Br. at A231.

in violation of the Standstill, culminated in TransCanada submitting a proposal for an acquisition of Columbia in late January 2016.

i

Poirier and Fornell exchanged a series of emails in the lead-up to the Columbia equity offering. The emails showed that Fornell wanted to reengage but that he was concerned about the Standstill. He asked Poirier if "your legal guys [have] talked to [Columbia's] legal guys to see if they are OK with my calling [Smith]?"[49] The Court of Chancery found that Poirier knew that the Standstill prohibited an approach by Fornell but that Poirier was "willing to push the limits."[50]

Johnston—TransCanada's in-house counsel—sent Poirier an email summarizing the Standstill on December 1. This email specified that, without written consent from the Columbia board, TransCanada could not:

1) Acquire, offer or agree to acquire ownership of equity securities or material assets
2) Seek to influence, advise, change or control [Columbia's] management or the board (including by soliciting proxies), or request amendment to the standstill provisions
3) Make any public disclosure or take actions that requires [Columbia] to make public disclosures with respect to matters that are the subject of this agreement.[51]

---

[49] *Liability Decision*, 299 A.3d at 418 (quoting JTX 418).
[50] *Id.*
[51] App. to Opening Br. at A834.

Poirier then forwarded this email to Girling, adding:

> See below. We basically must get [Columbia's] acquiescence to pursue this transaction, or even to seek to influence them. Under item 2, this extends to reaching out to board members without Bob[] [Skaggs's] knowledge or consent . . . .
>
> This is a standard provision in my experience . . . . I think this restricts our alternatives to you going through Bob [Skaggs], but as we discussed, that is the best option from a relationship standpoint.[52]

Girling called Skaggs the next day. The Court of Chancery found that this call was made despite Girling's understanding of the Standstill's prohibitions, but the email from Poirier indicates that Girling had been told that a call to Skaggs might be the only permissible outreach under the Standstill. Fornell also called Smith twice. The calls lasted just "40 seconds."[53] The Court of Chancery found that the circumstances surrounding these calls suggest that they touched on a potential transaction, meaning that they violated the Standstill.

The court further found that TransCanada "plainly understood what the Standstill prohibited" because the TransCanada board had asked its counsel to "review potential litigation exposure" following an update given by TransCanada management concerning these interactions with Skaggs and Smith.[54] A review of an opinion letter provided to TransCanada on December 15 suggests, however, that the TransCanada board's primary concern was *Columbia's* litigation exposure for

---

[52] *Id.*

[53] *Id.* at A234.

[54] *Liability Decision*, 299 A.3d at 419.

21

failing to disclose TransCanada's $26-per-share offer in the prospectus for its equity offering and whether that exposure could create leverage for TransCanada in future negotiations.[55] The opinion letter also stated that TransCanada's outside counsel "saw little risk" that TransCanada would be a named defendant in a stockholder lawsuit targeting Columbia.[56]

ii

TransCanada and its advisors interacted with Columbia management twice more in December 2015. First, on December 8, Skaggs and Smith met Fornell at an energy conference organized by Wells Fargo. The record provides few details of the conversation that took place at this meeting, but once the meeting was over, Fornell called Poirier. Poirier then sent a text to Girling stating that he had "more intel on [Columbia]."[57] Based on this circumstantial evidence, the Court of Chancery found that the December 8 meeting at least "touched on" the topic of a transaction and violated the Standstill.[58]

The next week, on December 17, Poirier called Smith. There is no doubt that this call touched on the topic of a transaction. Poirier suggested that Smith meet with him in early January. He also "indicated that [TransCanada] could be at

---

[55] *See* App. to Answering Br. at B16.
[56] *Id.* at B21.
[57] App. to Opening Br. at A235.
[58] *Liability Decision*, 299 A.3d at 419–20.

$28/share."[59]   The Court of Chancery found that this call, too, breached the Standstill. Poirier called and text-messaged Smith on January 4, confirming that the pair would meet on January 7, 2016, and requesting new confidential information so that he could prepare for the meeting.[60]   The Court of Chancery found that these communications again breached the Standstill.

Poirier also noted that TransCanada would want access to a new electronic data room. Smith passed this information along to Robert Smith,[61] Columbia's general counsel, who, with help from Columbia's outside counsel, Sullivan & Cromwell LLP, began preparing a data room for TransCanada's benefit. Next day, without approval from the Columbia board, Smith emailed 190 pages of confidential information to Poirier. This information, except for updated financial projections, was largely duplicative of the information provided during the November sale process.

The Court of Chancery noted that "Poirier also wanted comfort on the standstill" in advance of the January 7 meeting.[62]   This concern led to an exchange of emails and a call between Robert Smith and Johnston. The court found that in this call, "the attorneys reasoned themselves into concluding that the January 7

---

[59] App. to Opening Br. at A236.

[60] TransCanada had properly complied with Columbia's late-November return-or-destroy instruction.

[61] To avoid any confusion, this opinion refers to Robert Smith by his full name and Stephen Smith by his surname.

[62] *Liability Decision*, 299 A.3d at 421.

meeting could go forward, even though TransCanada was clearly seeking to acquire Columbia."[63]

iii

Goldman prepared a list of talking points for Smith to use at the January 7 meeting with Poirier and emailed them to both Smith and Skaggs. Skaggs described the talking points as "[g]ood stuff."[64] The talking points instructed Smith to mention that Columbia was "pleased with the execution" of the equity offering, but would "do what's right for shareholders" by "keeping this dialogue open."[65] They also instructed Smith to inform TransCanada that as far as the Columbia board was concerned, "it will come down to two issues: 1) price; and 2) certainty."[66] As to price, the talking points noted that "TC was at $26 and CPG was at $30.00, and [Poirier] or [Girling] indicated you could be at $28.00 before our equity offering."[67] The notes further instructed Smith to tell Poirier that, to avoid an auction process, TransCanada should "lean in on price as much as possible ('don't get penny wise and pound foolish') as every dollar matters a lot to [the Columbia] board."[68] Lastly, the talking points instructed Smith to tell Poirier that "if [TransCanada's] interest is

---

[63] Id.
[64] App. to Opening Br. at A837.
[65] Id.
[66] Id.
[67] Id.
[68] Id.

real, I'd suggest that you have [Girling] meet with [Skaggs] and make a proposal well in advance of our Board meeting on January 28th."[69]

At the January 7 meeting, Smith began walking through the talking points from Goldman, before he "literally pushed the page across the table and gave it to Poirier."[70] Doing so was "uncharacteristic" for an M&A negotiator, and in the court's view, sent another signal that Smith "trusted Poirier and was open to a deal."[71]

For the rest of the meeting, "Smith shared information freely."[72] He confirmed that there was some disconnect between management's and the board's appetite for a sale. He also reiterated that Skaggs wanted a proposal on or before January 27 so that he would have something to present to the Columbia board on January 28. At one point, Poirier stated that TransCanada would want 30 to 45 days of exclusivity to which Smith responded that TransCanada would be unlikely to face competition in its bid to acquire Columbia. The court found this to be yet another statement made by Smith that signaled his inexperience and further revealed the Columbia management team's desire to sell.

---

[69] *Id.*
[70] *Liability Decision*, 299 A.3d at 422.
[71] *Id.*
[72] *Id.*

The court also found that, like previous meetings, the January 7 meeting breached the Standstill. Shortly after the meeting, Columbia granted TransCanada access to the data room, and TransCanada spent the following weeks engaged in due diligence. Much of TransCanada's due diligence focused on the size of the Columbia management's change-in-control payments, which, in the price range TransCanada intended to pay, totaled roughly $112 million dollars. Around the same time, to drum up support for a deal at the January 28 board meeting, Skaggs conducted a series of one-on-one meetings with Columbia directors.

iv

In response to Smith's request that TransCanada make a proposal in advance of the January 28 board meeting, Girling planned to call Skaggs with an expression of interest on January 25. Other than the brief exchange between Robert Smith and Johnston in advance of the January 7 meeting, neither Columbia nor TransCanada appear to have considered that an expression of interest by TransCanada might violate the Standstill until TransCanada's in-house counsel raised the point on January 25—the day Girling was scheduled to call Skaggs. Recall that, under the Standstill, TransCanada had agreed not to "acquire or offer to acquire, or seek, propose or agree to acquire" Columbia absent written consent from the Columbia board.[73] Yet in advance of Girling's call, Johnston, on behalf of TransCanada,

---

[73] App. to Opening Br. at A827–28.

emailed Robert Smith to confirm that an "offer or proposal" from Girling to Skaggs would not breach the Standstill. She also added "I expect you can appreciate that we don't want to be in a position where we contravene our agreement with your company."[74]

Robert Smith forwarded the email to the lead partner on the Columbia team at Sullivan & Cromwell with the message "see below. Will call Chris shortly acknowledging that an offer is not in contravention with the standstill agreement. Let me know if you have any questions."[75] The partner responded simply, "agree."[76]

Robert Smith then replied to Johnston. He wrote, "Thanks Chris, I confirm by this email that receipt of an offer to purchase our securities in this context would not violate or be in contravention with the terms of the NDA, including the standstill provision."[77] Johnston responded that she was comfortable with Girling calling Skaggs that day, but in her view, moving forward would "appear to require more explicit Board direction."[78] Robert Smith forwarded this email to Sullivan & Cromwell with the message "pls let me know your thoughts on Chris' comment . . . ."[79] The lead partner replied "I think a formal proposal they are right, but what we're doing now is fine. Just emphasize that what we approve them doing

---

[74] *Id.* at A839.
[75] *Id.*
[76] *Id.*
[77] *Id.* at A841.
[78] *Id.* (emphasis in original).
[79] *Id.* at A841.

is making a private, non-public indication for discussion of a negotiated transaction and discussion of whether the board wants to initiate negotiations."[80]

To summarize these back-and-forth communications concerning the propriety of further discussions in light of the Standstill, Columbia's general counsel, after consulting with Columbia's outside counsel, advised TransCanada's general counsel that an informal offer would not violate the Standstill. Even so, the court found that Johnston's email seeking confirmation that a call from Girling would not breach the Standstill was itself a breach of the Standstill.

v

Following the parties' general counsel's apparent resolution of the Standstill issue, Girling called Skaggs. He told Skaggs that, to avoid violating the Standstill, Skaggs should not view this proposal as an offer.[81] He then reported to Skaggs that TransCanada remained interested in acquiring Columbia at a price between $25 and $28 per share. Girling also asked for 45 days of exclusivity. Skaggs told Girling that he would take the proposal to the Columbia board but warned Girling that the board would be pushing for the top of the price range. The day after this call—January 26—Skaggs relayed to the Columbia board that he had received a proposition from TransCanada to acquire Columbia.

---

[80] *Id.*

[81] The court found that, regardless of the language Girling used, the proposal by TransCanada violated the plain language of the Standstill. *See Liability Decision*, 299 A.3d at 427.

28

The Columbia board met over two days on January 28 and 29. At this meeting, Skaggs presented TransCanada's $25 to $28 proposal and characterized it as sufficiently "firm" to warrant granting TransCanada exclusivity.[82] The board also discussed succession planning with Skaggs, a discussion in which the "implicit message" was that a deal would avoid the expense and risks associated with finding someone to replace Skaggs as CEO.[83] The Columbia board ultimately granted TransCanada exclusivity until March 2, 2016.

F

After the board meeting, Skaggs called Girling and told him that the board had agreed to exclusivity. Columbia's counsel at Sullivan & Cromwell suggested an informal exclusivity agreement to avoid creating a "thread for plaintiffs' lawyers to pull on[,]" but TransCanada insisted on a written document.[84] The parties executed an addendum to the NDA that gave TransCanada access to Columbia's agreements with its customer-producer counterparties—documents critical to understanding Columbia's business—before executing an exclusivity agreement on February 1, 2016 that was to run for 30 days. In brief, the agreement granted TransCanada exclusivity until March 2 so long as TransCanada was interested in acquiring Columbia at $25 to $28 per share. It also granted the Columbia board a

---

[82] *Id.* at 429.
[83] *Id.*
[84] *Id.*

good-faith fiduciary out, enabling the board to entertain an inbound proposal if failing to do so would be reasonably expected to result in a breach of the board's fiduciary duties.

i

With the exclusivity agreement in place, merger negotiations resumed. On February 3, the two management teams held a conference call to discuss merger structure and agreed to target a February 29 announcement date. Columbia sent TransCanada a draft merger agreement the next day.

Skaggs and Smith asked Fornell if he could schedule a meeting for February 9. The purpose of the meeting was to confirm that TransCanada could successfully finance an acquisition and find the quickest path to close a deal. After hearing about the meeting request, Poirier called Fornell and others at Wells Fargo to ask why, in his view, Skaggs and Smith were behaving strangely. Smith had repeatedly commented to Poirier that despite the turmoil in energy markets and Columbia's depressed stock price that "this is not a wasted effort [of] due diligence."[85] Poirier thought this could be a signal that Columbia would run a competitive process if TransCanada failed to meet the bottom of the range it had suggested. Fornell, on the other hand, thought that this comment signaled that Columbia was open to a deal below $25 per share.

---

[85] *Id.* at 431 (quoting JTX 708) (internal quotation marks omitted).

30

At the February 9 meeting, Skaggs expressed concern that TransCanada would struggle to secure financing for a deal. Poirier attempted to allay these concerns, and his comments were backed up by Smith. Because of Smith's support for TransCanada's position, Poirier came away from the meeting thinking that Columbia's management remained enthusiastic about a deal. Smith and Poirier spoke the next day. Smith's talking points for that meeting suggested that he should again emphasize that this opportunity for TransCanada would be "unburdened by the 'typical' social issues."[86]

ii

Momentum toward a deal slowed in mid-February. On February 12, Girling called Skaggs to tell him that, although TransCanada's valuation of Columbia had not changed, he was becoming uneasy with the premium over Columbia's market price—then around $17 per share—of a deal in the $25 to $28 range. On February 19, credit agencies informed TransCanada that its proposal for financing the merger would cause its credit rating to drop from A- to BBB-. Poirier informed Smith that this rating assessment made it impossible for TransCanada to proceed with its existing financing plan for the acquisition.

Poirier and Smith spoke again on February 24. Porier repeatedly suggested a deal at a lower price, without any pushback from Smith. Poirier took this silence to

---

[86] *Id.* (quoting JTX 715 at 23).

mean that "management wants to get this done" and that Skaggs and Smith would be willing to present a lower price to the board and "dare them to turn it down."[87] Girling called Skaggs later that day. He reported that TransCanada needed more time to secure financing for a deal at $25 to $28 per share and warned that a cash deal might not be achievable within this range. Skaggs did not terminate discussions with TransCanada; he instead informed Girling that he would like to "get done with this in a week."[88]

Skaggs passed Girling's concerns on to the Columbia board, suggesting that TransCanada might present an offer below the range it had proposed or an offer backed by a different financing arrangement than the all-cash deal initially contemplated. In an email exchange with Cornelius, Skaggs floated the idea of a mixed-consideration deal with less than $25 per share in cash. Cornelius stated that he had little interest in a deal with a cash component of less than $25 per share and might not even counter such an offer.

iii

With exclusivity set to expire at midnight on March 2, TransCanada asked for an extension until March 14 to finalize an offer. Columbia management recommended, and the Columbia board agreed, to extend exclusivity until March 8

---

[87] *Id.* at 432.
[88] *Id.*

because Skaggs was confident from his conversations with the TransCanada deal team that he would receive a proposal from Girling on March 5.

On March 3, Robert Smith emailed Johnston about the impending offer, asking her whether she still had any concerns about the Standstill. In the meantime, Johnston had asked TransCanada's outside counsel whether there was "anything we should do [concerning the Standstill] to ensure that we are not offside."[89] TransCanada's outside counsel recommended that Johnston confirm that the Columbia board consents to the discussion. Johnston emailed Robert Smith seeking this confirmation.

The Columbia board met on March 4 and heard a presentation on the Standstill agreement from Sullivan & Cromwell. At this meeting, the Columbia board formally authorized management to send a written request to TransCanada asking for a merger proposal. Robert Smith sent this written request to Johnston the same day. It read: "The Board has authorized me to advise you that the board of [Columbia] requests an offer from TransCanada for a Transaction . . . at the meetings or calls between the CEOs scheduled for March 5, 2016 . . . ."[90] The Columbia board also recommended waiving the NDAs and standstill agreements binding any other

---

[89] *Id.* at 433 (quoting JTX 813 at 1).
[90] App. to Opening Br. at A256.

prospective acquirors at the conclusion of TransCanada's exclusivity period on March 9.

iv

On March 5, Poirier called Smith and suggested a transaction at $24 per share in cash. Smith responded with "colorful language" and accused Poirier of "wasting his time."[91] Girling then called Skaggs and formally made an offer at $24 per share. Skaggs testified at trial that, upon hearing the offer, he "absolutely lost it" with Girling.[92] Smith, without authorization from the Columbia board, called Poirier later that day and told him that TransCanada needed to increase its offer before the Columbia board meeting scheduled for that evening. He further told Poirier that TransCanada would need to be at $26.50 per share to "get the board's attention."[93] After that, Girling called Skaggs to make a new offer of $25.25 per share, the midpoint between the initial $24 offer and Smith's $26.50 suggestion. This was the highest price that Girling had authority from the TransCanada board to offer.

The Columbia board met that evening. Skaggs reported the initial $24 per share offer as well as his and Smith's disappointment with it. Smith also related that he had conveyed to TransCanada that $26.50 per share was a more acceptable price

---

[91] *Liability Decision*, 299 A.3d at 434.
[92] *Id.*
[93] *Id.*

that management would feel comfortable recommending to the board. Skaggs then presented the $25.25 offer and recommended against accepting it.

The Columbia board directed management to reject the offer. Skaggs called Girling to relay the news to which Girling responded "I guess that's it."[94] Poirer tried to salvage the deal by calling Smith and stating that $25.25 was the highest price TransCanada could offer.

v

The prospect of a deal was revived by Goldman and Wells Fargo. Fornell told Goldman on March 6 that, were TransCanada to receive a counter, it might consider a deal between $25.25 and $26.50. Goldman informed Skaggs, Smith, and Kettering that TransCanada was still open to a deal. During a conference call, Skaggs, Smith, and Kettering agreed that they could recommend a price of $26 per share. Skaggs then reached out to Cornelius. Based on this conversation, management instructed Goldman to tell Wells Fargo that the Columbia board would "do 26. Not a penny less."[95] Smith separately called Poirier to convey the same message. A few days later, Smith heard from two investment banks that there were "credible rumors" on the street that "TransCanada was in advanced discussions with Columbia."[96] One banker also reported that *The Wall Street Journal* was preparing a story.

---

[94] *Id.* at 435 (quoting JTX 863).
[95] *Id.* (quoting JTX 885).
[96] *Id.* at 436.

The TransCanada board met on March 9 to consider how to respond to Columbia's $26 counter. The board's reception was positive. At the meeting, Wells Fargo presented a valuation analysis that placed $26 per share in the lower half of its suggested range. The board also noted that TransCanada's exclusivity had expired on March 8 but that interloper risk was low. The board, aware of the rumors about a *Wall Street Journal* article, next discussed how a potential media leak might affect the parties' stock prices. At the conclusion of the meeting, the TransCanada board unanimously authorized an offer of $26 per share, comprising 90% cash and 10% TransCanada stock.

## G

Poirier called Smith to relay the $26-per-share offer. But he told Smith that there were three things that might jeopardize a transaction at this price. First, if the rating agencies did not view the transaction favorably; second, if TransCanada's stock price fell below $49 per share CAD; and third, whether TransCanada's underwriters would support a "bought deal"[97] on the equity issuance needed to finance the cash portion of the deal.

---

[97] "A bought deal is a securities offering in which an investment bank commits to buy the entire offering from the client company[,] . . . eliminat[ing] the issuing company's financing risk [and] ensuring that it will raise the intended amount." Investopedia, *Bought Deal: Meaning in Initial Public Offerings*, (June 4, 2023), https://www.investopedia.com/terms/b/boughtdeal.asp (last visited June 6, 2025).

The Court of Chancery found that at the end of this call, "Smith orally accepted the $26 offer[,]" and "[f]rom that point on, both sides acted as if they had an agreement in principle."[98] The court based this conclusion on "three strands of circumstantial evidence."[99]

First, the court considered Wells Fargo's understanding of the status of the transaction. An email circulated among the Wells Fargo deal team stated, "they accepted $26 with 10% stock but are trying to negotiate down the break fee."[100] The materials used by the Wells Fargo committee working on a fairness opinion for the final deal stated that the "[Columbia] board accepted this preliminary offer on the morning of March 10, 2016."[101] Other sections of the materials used by the committee also stated that Columbia had "accepted" the $26 deal.

Second, the court relied on an exchange of text messages between TransCanada's senior executives. One described TransCanada as having a "done deal."[102] The court also noted that Skaggs had sent the Columbia deal team a note treating the price term as settled, leaving only the break fee and fixed share conversion ratio for negotiation.

---

[98] *Liability Decision*, 299 A.3d at 437.
[99] *Id.*
[100] *Id.* at (quoting JTX 956 at 1).
[101] *Id.* (quoting JTX 1120 at 1).
[102] App. to Opening Br. at A855.

Third, the court focused on the fact that TransCanada's exclusivity had expired at midnight on March 8, but Columbia's management had not released the other bidders from their standstills on March 9 despite instructions to do so from the Columbia board. In the court's view, this was "[b]ecause [Columbia's management] thought they had a deal."[103]

ii

Skaggs scheduled a Columbia board meeting for the next day, March 10. Before the meeting, Skaggs emailed the board an agenda to guide the deliberations concerning TransCanada's March 9 offer. Skaggs's email also shared his understanding of the rationale underlying TransCanada's offer. More specifically, he understood that the offer purported to address Columbia's primary deal requirements: "(a) $26.00/share of value; (b) predominantly a cash transaction; and (c) certainty of close."[104] Skaggs also noted in his email that TransCanada did not request an extension of exclusivity.

Before the board could meet, however, *The Wall Street Journal* that morning published an article reporting that TransCanada was in "takeover talks" with Columbia.[105] It is not clear how news of the transaction was leaked. As the Court

[103] *Liability Decision*, 299 A.3d at 437.
[104] App. to Opening Br. at A265.
[105] *Id.* at A869. *See also* Ben Dummett, Dana Cimilluca, and Dana Mattioli, *Keystone Pipeline Operator TransCanada in Takeover Talks*, Wall St. J. (Mar. 10, 2016), https://www.wsj.com/articles/keystone-pipeline-operator-transcanada-in-takeover-talks-1457627686 (lasted visited June 6, 2025).

of Chancery noted, both TransCanada and Columbia each had their own incentives for leaking the news. In the court's opinion, however, TransCanada "was a more likely source" of the leak because "news of a bid can cause arbitrageurs to enter the target company's stock, which puts pressure on the target board to take a deal."[106] In any event, after the story broke, the New York Stock Exchange briefly halted trading in Columbia's common stock, and both the New York Stock Exchange and the Toronto Stock Exchange briefly halted trading in TransCanada's common stock.

The Columbia board nevertheless met as planned. At the meeting, Skaggs outlined TransCanada's offer to acquire Columbia at $26 per share and recommended that the board accept the offer. Skaggs also informed the board that the exclusivity period with TransCanada had expired two days earlier, on March 8. The board also considered that the *Wall Street Journal* article could lead to "inbound inquires" from other potential buyers.[107] Notably, the board did not vote to accept TransCanada's offer.

iii

After the meeting, Smith called Poirier. Poirier asked Smith if Columbia could give TransCanada another two weeks of exclusivity. In response to Poirier's request, Smith told him that, because of the leak, the Columbia board was "freaking

---

[106] *Liability Decision*, 299 A.3d at 436.
[107] App. to Opening Br. at A266.

39

out and told the management team to get a deal done with [TransCanada] 'whatever it takes.'"[108] At trial, Fornell testified that Smith's statement "struck [him] as odd" because it was unusual for a "counterparty to tell you that their board is freaking out."[109] Fornell told his team at Wells Fargo that "[o]ddly, the [Columbia] team has relayed this info to [TransCanada]," to which one of his team members responded, "Turmoil provides opportunity. [TransCanada] would appear to be well positioned."[110] Thinking along the same lines, two TransCanada executives—the chief operating officer and the president—stated in text messages that TransCanada and Columbia "had a deal as offered[,]" but given the leak, there "may be an opp[ortunity] to go back to [Columbia] with a lower price."[111] In sum, given Smith's statement to Poirier and the *Wall Street Journal* article, an opportunity emerged for TransCanada to craft a better deal for itself, and, as will be developed more fully below, that is exactly what it did.

---

[108] *Liability Decision*, 299 A.3d at 438 (quoting JTX 952 at 1). At trial, TransCanada argued that Smith never made this statement to Poirier. The court, however, "[a]fter taking into account Smith's candor and his belief that he and Poirier were working together to get a deal done, [determined] that when Poirier asked for an extension of the exclusivity agreement, Smith responded that it would not be a problem because '[t]he [Columbia] board is freaking out' and had told the management team 'to get a deal done.'" *Id.* (citing JTX 952 at 1). Regardless of the exact words Smith used, the court found that he had conveyed a message of this nature to Poirier. *Id.*

[109] App. to Answering Br. at B139–40.

[110] *Liability Decision*, 299 A.3d at 438 (quoting JTX 952 at 1).

[111] *Id.* at 439; App. to Opening Br. at A855.

iv

Next day—March 11—the Columbia board met again. Smith informed the board of TransCanada's request for an additional two weeks of exclusivity, and Skaggs recommended granting the request on the condition that it lead to "a tight Critical Path to [a merger agreement] signing."[112] The board, rather than granting two weeks exclusivity, agreed to a one-week extension. Before signing the extended exclusivity agreement, Skaggs recommended that the board release the other bidders from their standstills. The board authorized the release, and letters releasing the other bidders from their standstills were delivered via email later that evening.

At the same meeting, Skaggs informed the board that he had received an email from Spectra's CEO earlier that morning, expressing Spectra's interest in acquiring Columbia and initiating discussions with the Columbia deal team. According to the Court of Chancery, the "Columbia management team had never been interested in a deal with Spectra and had little interest in engaging" with Spectra now.[113] The board simply "told Goldman to handle any interactions"[114] Working with Goldman, Skaggs developed a "script" for Columbia to use in response to any inbound merger inquiries, including from Spectra. The script, in its entirety, read: "We will not comment on market speculation or rumors. With respect to indications of interest in

---

[112] App. to Opening Br. at A268.
[113] *Liability Decision*, 299 A.3d at 439.
[114] *Id.*

41

pursuing a transaction, we will not respond to anything other than serious written proposals."[115]

When Spectra's CFO and head of M&A contacted Goldman the following day—March 12—about a potential deal, Goldman delivered the script. Unsatisfied with that response, Spectra replied that it could not be more specific about a potential deal unless Columbia agreed to give it access to non-public information so that more due diligence could be done. Goldman informed Skaggs and Smith that Spectra was "get[ting] serious" about an offer.[116] Spectra's CFO also made a follow-up call to Goldman, saying to "expect something formal, absent a 'major bust' in the 'next few days'"[117] and engaged Morgan Stanley & Co. LLC as its financial advisor.

Spectra's renewed interest led to the Columbia board meeting on March 12. During the meeting, the board engaged in discussions with management—including Skaggs—and representatives from Sullivan & Cromwell as to how, if at all, it should respond to Spectra's inquiries and apparent appetite for a deal. Specifically, Skaggs recommended that the board refrain from engaging with Spectra because Spectra was unlikely to pay more than TransCanada and that Columbia should instead devote its resources to "buttoning down" a deal with TransCanada.[118] The board ultimately

---

[115] *Id.* at 440 (quoting JTX 1025 at 1).
[116] *Id.* at 441; App. to Opening Br. at A274.
[117] *Liability Decision*, 299 A.3d at 441; App. to Opening Br. at A274.
[118] *Liability Decision*, 299 A.3d at 441.

determined "there was no reason to believe, based on the information available to it and taking into account the views of management, that engaging with Spectra was likely to lead to a transaction offering greater value to Columbia stockholders than TransCanada's most recent proposal."[119] Additionally, the board concluded that "pursuing discussions with Spectra would not be worth the risk of losing the potential transaction with TransCanada."[120] Therefore, the board approved the script and planned to focus on a deal with TransCanada.

v

After the March 12 meeting, Columbia's general counsel emailed Johnston to explain that Columbia would extend exclusivity to TransCanada for one more week and that Columbia wished to use the script to respond to any incoming inquiries from other potential buyers. After receiving the script, Poirier forwarded it to Wells Fargo. One of Fornell's colleagues at Wells Fargo questioned the phrase "serious written proposal," remarking that the phrase could entail anything from a formal financial bid subject only to confirmatory due diligence or "a per share price on a cocktail napkin."[121] Poirier, intending to "sniff out any issues" with the script, called Smith.[122]

---

[119] App. to Opening Br. at A273.
[120] *Id.*
[121] *Liability Decision*, 299 A.3d at 441 (quoting JTX 1029 at 1).
[122] App. to Answering Br. at B346.

After his call with Poirier, Smith texted a "real-time report"[123] to Skaggs, Kettering, and Robert Smith, which said:

> I think we are done. [Poirier] wanted to know the rationale [for the script] – I explained it and pointed out how important the Fiduciary protections were for our Board. Told him we wanted to get this deal done with them and this would help us achieve that goal. They were circling the wagons one last time and [Poirier] said he would have Chris [Johnston] reach out to Bob [Skaggs] to get it signed up once their meeting was concluded.[124]

Based on trial testimony from Poirier and Fornell, the court determined that, as a result of his call with Smith, "Poirier understood that Smith had made a 'commitment to the deal with TransCanada.'"[125] After the call, Poirier instructed TransCanada's counsel to sign off on the script, and Columbia's general counsel sent the exclusivity agreement to TransCanada later that day. Smith, convinced that the deal was "done[,]" went on vacation with his family and left Kettering to handle the transaction with TransCanada.[126]

As the court noted, "[t]he combination of Columbia's decision to extend exclusivity combined with management's commitment to a deal with TransCanada stunned Wells Fargo."[127] One banker at Wells Fargo remarked to a colleague that that he "[c]an't for the life of [him] figure out why [Columbia] would keep

---

[123] *Liability Decision*, 299 A.3d at 441.

[124] App. to Answering Br. at B347.

[125] *Liability Decision*, 299 A.3d at 441 (quoting Poirier Tr. 257; citing Fornell Tr. 74–75).

[126] *Id.* at 442 (citing JTX 1777 at 2).

[127] *Id.*

[TransCanada] exclusive."[128] To the court, the reason was obvious: "Skaggs, Smith, and Kettering wanted a deal."[129]

On March 13, a large Columbia stockholder—Capital Research—responded to the news that Columbia was considering a deal with TransCanada. Capital Research suggested that, given the bid from TransCanada, Columbia "should start a strategic review and test the market" and informed Columbia that it would not be averse to owning stock in TransCanada, Enbridge, Spectra, or NextEra as a result of a deal.[130] After receiving this statement from Capital Research, Kettering emailed Skaggs and Smith, suggesting that, "[a]t some point, we may want to let [Poirier] know a large shareholder is suggesting a process."[131] This message was never passed along to Poirier or anyone else at TransCanada.

H

The following day—March 14—was, as the Court of Chancery described it, "eventful."[132] First and foremost, Columbia and TransCanada executed a new exclusivity agreement granting TransCanada exclusivity through 5:00 p.m. Central time on March 18, 2016.

---

[128] *Id.* (quoting JTX 1065).
[129] *Id.*
[130] App. to Opening Br. at A276.
[131] *Id.*
[132] *Liability Decision*, 299 A.3d at 442.

45

That same morning, the TransCanada board met to discuss the potential deal with Columbia. TransCanada's underwriters confirmed that they would support a deal price of $26 per share, and the TransCanada's management team informed the board that "the market appeared to view the acquisition positively."[133] Despite this, Poirier and other members of the deal team saw "an opportunity to lower TransCanada's bid."[134] Girling chimed in, telling directors that he "would engage in discussions with [Columbia]'s management regarding an all-cash offer at US$25.50 per common share."[135]

After the TransCanada board meeting, Poirier reached out to Smith to see if they could set up a call around lunchtime. When Smith asked Poirier what the call would be about, Poirier vaguely responded that he wanted to give Smith "a thorough update" of where TransCanada was regarding the deal.[136] Smith, who was on vacation and scheduled to be on the golf course, assumed that the call would be uneventful and referred it to Kettering. Poirier, who was joined by TransCanada's chief operating officer, then called Kettering to give him the update. Contrary to what Smith had anticipated, this call was *very* eventful.

---

[133] *Id.* at 443.
[134] *Id.*
[135] *Id.* (quoting JTX 1092 at 2).
[136] *Id.* (quoting JTX 1777 at 2).

During the call, Poirier told Kettering that TransCanada's underwriters "thought including stock consideration was going to make the transaction challenging."[137] Poirier also pointed out to Kettering that TransCanada's stock price had dropped below the $49 CAD price point that TransCanada had identified as a condition in its $26 offer. This statement was true—on Friday, March 11, TransCanada's stock price had fallen to $47 CAD. Poirier then informed Kettering that, in light of these developments, TransCanada was now offering to acquire Columbia at $25.50 per share in cash. Poirier also told Kettering that if Columbia did not accept the offer, "TransCanada planned to issue a press release within the next few days indicating its acquisition discussions [with Columbia] had been terminated."[138]

The Columbia board met that evening to discuss the unanticipated $25.50 all-cash offer. According to the board minutes, Skaggs informed the board that "TransCanada's final proposal was to acquire the Company at a price of $25.50 per share in cash."[139] The meeting minutes indicate that the board discussed Spectra's recent statement that it would send a formal proposal in a few days and how accepting an offer from TransCanada might preempt any proposal from Spectra. The board decided to defer a formal response to TransCanada's offer until the

---

[137] *Id.* (citing JTX 1493 at 419).
[138] App. to Opening Br. at A278.
[139] *Liability Decision*, 299 A.3d at 444 (quoting JTX 191 at 16).

directors could meet in person on March 16 and receive full presentations and fairness opinions from their financial advisors. Until then, the board authorized management and Columbia's advisors to "continue working with TransCanada in the interim."[140]

I

Columbia's board met on March 16, 2016, to discuss TransCanada's latest offer. After considering fairness opinions from Goldman and Lazard, Columbia's board voted to approve the proposed merger at $25.50 per share. Skaggs called Girling and then let Smith and Kettering know that there was "an agreement in principle."[141]

The following day, TransCanada's board met to formally approve the transaction. During the meeting, Wells Fargo presented a discounted cash flow analysis that valued Columbia as a standalone business at $26.51 per share. Taking into account projected annual costs and revenue synergies by 2018, Wells Fargo valued Columbia's shares at an additional $1.93 per share. As the court noted, "[f]rom TransCanada's standpoint, they were buying an asset valued at [about] $28.45 per share" for $25.50 per share.[142] TransCanada's board voted to approve the merger. Later that day, Columbia and TransCanada executed an agreement and

---

[140] *Id.* (quoting JTX 191 at 17).
[141] *Liability Decision*, 299 A.3d at 446 (quoting JTX 1686).
[142] *Liability Decision*, 299 A.3d at 446.

plan of merger (the "Merger Agreement") and issued a press release announcing the merger.[143] In response to a congratulatory text from his financial advisor about the merger, Smith wrote, "Thanks, Rick, do you think I can retire now?"[144]

After the Merger Agreement was signed, Columbia's sale process began its final phase, which, as the court observed, was "uneventful."[145] The Merger Agreement contained a standard no-shop provision that prohibited Columbia from engaging with competing bidders.[146] The no-shop provision did, however, provide a fiduciary out, allowing Columbia to respond to a "Superior Proposal" from a competing bidder.[147] Under the Superior Proposal carveout, Columbia was permitted to engage with a competing bidder if its board determined that failing to engage "would reasonably be expected to result in a breach of the directors' fiduciary duties."[148] In the event that Columbia received a Superior Proposal, the Merger Agreement entitled TransCanada to a four-day, unlimited right to match it. As the court noted, "[b]ecause TransCanada could match any competing bidder, an overbid could succeed only by driving the bidding beyond TransCanada's reserve price."[149]

---

[143] *See* App. to Opening Br. at A898–995.
[144] *Liability Decision*, 299 A.3d at 446 (quoting JTX 1138).
[145] *Id.*
[146] App. to Opening Br. at A286–87.
[147] *Id.* at A942–43.
[148] App. to Opening Br. at A943.
[149] *Liability Decision*, 299 A.3d at 446.

TransCanada developed concerns about interloper risk in early April when Poirier informed the board that he had "received credible information" that Enbridge was considering making a bid.[150] Poirier, concerned with the possibility of a competing bid raising the deal price, encouraged his team to "put pressure" on banks that TransCanada worked with to not provide any financing for an Enbridge bid.[151] With the lingering threat of possible interlopers, TransCanada's board held a two-day meeting at the end of April at which TransCanada's management presented a "detailed interloper strategy."[152] At the meeting, management was told that there was a "positive market reaction" to the merger and that "TransCanada can afford to increase its offer" if needed.[153] The court observed that the materials relied on by management at this meeting "analyzed financing strategies for paying up to $28 per share."[154] In the end, no other bidders emerged.

J

Under the Merger Agreement, TransCanada had a role to play in Columbia's preparation of its proxy statement (the "Proxy"). Section 5.01(a) of the Merger Agreement required TransCanada to "furnish all information concerning themselves

---

[150] *Id.* at 447 (quoting JTX 1184 at 1).
[151] *Id.*
[152] *Id.* (citing JTX 1244 at 242).
[153] *Id.* (citing JTX 1244 at 243).
[154] *Id.* (citing JTX 1244 at 253).

and their Affiliates that is required to be included in the Proxy Statement."[155]  In that

same section, TransCanada agreed that none of the information that it provided

> for inclusion or incorporation by reference in the Proxy Statement will, at the date of mailing to stockholders of the Company or at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.[156]

Building on those disclosure obligations, Section 5.01(b) of the Merger Agreement

stated that if

> any information relating to the Company, Parent, US Parent or any of their respective Affiliates, officers or directors *is discovered* by the Company or Parent which should be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement or the other filings shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, *the party that discovers such information shall promptly notify the other parties* . . . .[157]

Before the Proxy was disseminated to Columbia's stockholders, TransCanada

management—including, Girling, Johnston, and Poirier—had the opportunity to

review and comment on it.[158]  Poirier and other TransCanada executives promised

Columbia that they would read the background section of the Merger Agreement

---

[155] App. to Opening Br. at A947.
[156] *Id.* at A947–48.
[157] *Id.* at A948 (emphasis added).
[158] *Id.* at A286.

51

"carefully."[159] The court found that, "[a]t Johnston's request, Poirier and Girling focused specifically on the 'Background of the Merger' and the description of their interactions with Smith and Skaggs."[160] At trial, it came to light that Poirier had provided Johnston with comments on the draft proxy statement, including comments about interactions that Poirier and Girling had had with Smith and Skaggs. When Poirier and Johnston discussed these comments with Girling, Girling simply said, "I am not worried about it, this is [Columbia's] document."[161] Joint exhibits at trial demonstrated that TransCanada's outside counsel also reviewed and commented on the Proxy.

On May 18 Columbia issued the Proxy and recommended that its stockholders approve the merger. Skaggs signed the Proxy on behalf of Columbia; Girling and Johnston, among others, signed on behalf of TransCanada.

Columbia held a special meeting of stockholders on June 22, 2016, to vote on the Merger Agreement. At the meeting, holders of 73.9% of the outstanding shares voted in favor of the merger. Just over a week later, on July 1, the merger closed. Skaggs, Smith, and Kettering all retired shortly after that. Based on the merger's closing price of $25.50 per share, Skaggs received retirement benefits of $26.84 million—$17.9 million more than he would have received absent a change-in-control

---

[159] *Liability Decision*, 299 A.3d at 447 (quoting JTX 1276 at 1).
[160] *Id.* at 447–48 (citing JTX 1183; JTX 1185; JTX 1187).
[161] *Id.* (quoting JTX 1210).

transaction. Similarly, Smith received $10.89 million in benefits—$7.5 more than he would have otherwise received—and Kettering received $8.38 million—$5.58 million more than would have received without the merger.

II

A

In September 2017, Columbia investors holding 963,478 shares—worth $203 million at the deal price—petitioned the Court of Chancery for appraisal.[162] The court held a five-day trial in October 2018. In August 2019, the court issued its decision in the appraisal action, finding that the fair value of Columbia's common stock on the effective date of the merger was $25.50 per share.[163] Despite finding that the deal price was fair, the court concluded that the Proxy contained material misstatements and omissions. In the court's own words, "[i]n light of the flawed Proxy, this decision does not give any weight to the stockholder vote for the purpose of elevating the reliability of the deal price."[164]

While the appraisal action was pending in the Court of Chancery, a Columbia stockholder filed a separate complaint alleging that Skaggs, Smith, and all the former Columbia board members had breached their fiduciary duties in connection with the merger. The complaint also alleged that TransCanada had aided and abetted the

[162] *See Appraisal Decision*, 2019 WL 3778370.
[163] *Id.* at *1.
[164] *Id.* at *36.

fiduciary breaches and was therefore jointly and severally liable. Once the appraisal litigation concluded, the stockholder filed an amended complaint, dropping its claims against all directors other than Skaggs. At the same time, a second stockholder filed almost identical claims, and the two cases were consolidated into the action that went to trial and is before us now.

B

In this action, only Skaggs, Smith, and TransCanada were named as defendants. During discovery, however, the plaintiffs entered into a settlement agreement with Skaggs and Smith, under which those defendants agreed to pay $79 million in return for dismissal of the claims against them. This left only TransCanada to defend the claims that it aided and abetted any breaches of fiduciary duty by Skaggs, Smith, and the Columbia board of directors arising from the merger. At trial, plaintiffs pressed two distinct claims against TransCanada for aiding and abetting. First, plaintiffs argued that TransCanada aided and abetted fiduciary breaches during the sale process. And second, plaintiffs alleged that TransCanada aided and abetted breaches of the duty of disclosure in relation to the Proxy.

C

After holding a five-day trial, the Court of Chancery issued a comprehensive opinion, finding that the plaintiffs prevailed on both the sale-process claim and the disclosure claim. Applying an enhanced-scrutiny standard of review to the

54

plaintiffs' sale-process claim, the Court of Chancery found that Skaggs and Smith breached their duty of loyalty as corporate officers and that the Columbia board breached its duty of care. The plaintiffs proved, the court wrote, that "Skaggs and Smith . . . were motivated by self-interest tied to their change-in-control agreements and their desire to retire in 2016, and . . . [that] their conflict of interest led them to take steps that fell outside the range of reasonableness."[165] According to the court, the plaintiffs also proved that the directors failed "to provide sufficiently active and direct oversight of the sale process[]"[166] and thus breached their duty of care.

The Court of Chancery then turned to the plaintiffs' aiding-and-abetting claim against TransCanada, beginning with what the court described as "[t]he most critical element of an aiding-and-abetting claim:"[167] the defendant's knowing participation in the breach. As will be discussed in greater detail below, as to this element, the court found that the plaintiffs proved that TransCanada had constructive knowledge of and culpably participated in Skaggs's and Smith's fiduciary-duty breaches.

The Court of Chancery then assessed damages for the sale-process claim at $1.00 per share or $398,436,581 based on findings that "but for the sell-side fiduciaries' breaches of duty, aided and abetted by TransCanada, the parties would

---

[165] *Liability Decision*, 299 A.3d at 460.
[166] *Id.*
[167] *Id.* at 470.

have executed a merger agreement based on the $26 Deal. . . .[and that] the $26 Deal was worth $26.50 per share at closing[.]"[168]

The Court of Chancery also found TransCanada liable for aiding and abetting the Columbia directors' and officers' breaches of the duty of disclosure. As the court saw it, because TransCanada had a right under the Merger Agreement to review the Proxy and an obligation to inform Columbia of any material omissions but remained silent when the draft Proxy failed to disclose the full panoply of Skaggs's and Smith's interactions with TransCanada in the sale process, it "knowingly permit[ted]"[169] Columbia to issue a misleading proxy statement. This, according to the court, amounted to knowing participation in the Columbia directors' and officers' issuance of a proxy statement that contained material misstatements and omissions.

As to damages for the disclosure claim, the court found that, because the plaintiffs had not introduced any evidence of reliance as required under *Dohmen v. Goodman*,[170] it could not award plaintiffs the compensatory damages they sought.[171] The court observed, however, that "equity will not suffer a wrong without a

[168] *Id*. at 481–82.
[169] *Id.* at 408.
[170] 234 A.3d 1161 (Del. 2020).
[171] *Liability Decision*, 299 A.3d at 490–94.

56

remedy"[172] and awarded plaintiffs *nominal* damages of $0.50 per share or approximately $199,218,290.50.[173]

One year later, the Court of Chancery issued its decision determining the proper allocation of damages among TransCanada, Skaggs, and Smith under the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA").[174] The court determined that TransCanada was entitled to a credit against its liability equal to the greater of Skaggs and Smith's settlement amount with the plaintiffs, which was $79 million, or the proportionate share of damages for which Skaggs and Smith were responsible. In allocating the damages under DUCATA, the court determined that TransCanada bore responsibility for 50% of the sale-process claim damages and 42% of the disclosure claim damages. Because the damages were noncumulative, the court clarified that the plaintiffs were only entitled to the larger of the two awards—the sale-process claim damages. Consequently, the court determined that TransCanada was liable to the tune of $199,218,290 for its role in aiding and abetting Skaggs's, Smith's, and the Columbia board's fiduciary breaches during the sales process.

---

[172] *Id.* at 494.
[173] *Id.* at 496.
[174] *See In re Columbia Pipeline Grp., Inc. Merger Litig.*, 316 A.3d 359 (Del. Ch. 2024).

57

D

TransCanada now appeals the Court of Chancery's post-trial decision, as well as the court's decision allocating the damages under DUCATA. Specifically, TransCanada raises four issues on appeal. TransCanada argues that the court erred in (1) finding that TransCanada aided and abetted any sale-process breach by Skaggs, Smith, or the Columbia board; (2) finding that TransCanada aided and abetted any disclosure breach by Skaggs, Smith, or the Columbia board; (3) awarding over $199 million in *nominal* damages for the disclosure claim; and (4) allocating fault among Skaggs, Smith, and TransCanada under DUCATA.

Because we reverse the Court of Chancery's finding that TransCanada aided and abetted the sale-process breaches and disclosure breaches, we need not address the issues of nominal damages for the disclosure claim or the allocation of damages under DUCATA.

III

Whether an acquiror aided and abetted fiduciary breaches by a target company's management and board involves both factual findings and questions of law.[175] We "afford the trial court's factual findings a 'high level' of deference"[176] and will not disturb them "so long as they are sufficiently supported by the record,

---

[175] *Mindbody*, 332 A.3d at 389.
[176] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (quoting *United Techs. Corp. v. Treppel*, 109 A.3d 553, 557 (Del. 2014)).

58

are the product of an orderly and logical reasoning process, and are not clearly erroneous."[177]   One such factual finding is whether the acquiror acted with scienter.[178]   We review questions of law, such as the Court of Chancery's "formulation and application of legal principles," *de novo*.[179]

IV

A

The courts of this State have long recognized that a third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to stockholders.[180] When confronted with such a claim, our courts are guided by this Court's formulation of the tort in *Malpiede v. Townson*.[181]   In that opinion, we recognized that "the four elements of aiding and abetting claim:  (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach of the defendants, and (4) damages proximately caused by the breach."[182]

Claims of aiding and abetting a breach of fiduciary duty are a particular instantiation of the more general principle under which secondary tort liability is

---

[177] *Energy Transfer, LP v. Williams Cos., Inc.*, --- A.3d ---, 2023 WL 6561767, at *15 (Del. Oct. 10, 2023) (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)).

[178] *Mindbody*, 332 A.3d at 391 (quoting *RBC*, 129 A.3d at 862).

[179] *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 483 (Del. 2024) (quoting *Reddy v. MBKS Co., Ltd.*, 945 A.2d 1080, 1085 (Del. 2008)).

[180] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984)).

[181] 780 A.2d 1075 (Del. 2001).

[182] *Id.* at 1096 (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

imposed on actors—sometimes referred to accessories—for another actor's breach

of duty to a third person. Here, the Court of Chancery relied on the Restatement

(Second) of Torts' explanation of this concept. Specifically, the court turned to

§ 876 of the Restatement (Second) of Torts, which states:

§ 876 Persons Acting in Concert

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Whereas § 876 of the Restatement (Second) of Torts treats liability for both

aiding and abetting and civil conspiracy, the Restatement (Third)[183] of Torts § 28

focuses more narrowly on aiding and abetting as a form of secondary liability:

---

[183] We have previously declined to adopt sections of the Restatement (Third) of Torts in this state where those sections define concepts "in a way that is inconsistent with this Court's precedents and traditions[,]" in particular where our development of the common law via the Restatement (Third) would conflict with our deference to the primacy of the legislative branch on issues of social policy. *Riedel v. ICI Americas Inc.*, 968 A.2d 17, 20–21 (Del. 2009), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018). In later cases, where we have no such concerns, we have considered and adopted parts of the Restatement (Third). *See, e.g.*, *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 384 (Del. 2023); *Rogers v. Christina School Dist.*, 73 A.3d 1, 16 (Del. 2013).

## § 28 Aiding and Abetting

A defendant is subject to liability for aiding and abetting a tort upon proof of the following elements:

> (a)   a tort was committed against the plaintiff by another party;

> (b)   the defendant knew that the other party's conduct was wrongful;

> (c)   the defendant knowingly and substantially assisted in the commission or concealment of the tort; and

> (d)   the plaintiff suffered economic loss as a result.

TransCanada does not challenge the Court of Chancery's finding that Skaggs and Smith breached their duty of loyalty as corporate officers by favoring their self-interest over the interests of Columbia and its shareholders. Nor does TransCandaa contest the court's finding that the Columbia board breached its duty of care by failing to provide sufficient oversight of the sale process. Instead, TransCanada's position on appeal is that neither the law nor the record support the Court of Chancery's conclusion that it knew of the breaches or culpably participated in them.

As mentioned, the Court of Chancery found that "[t]he plaintiffs proved that TransCanada knowingly participated in the breaches of duty that took place during the sale process."[184] The court also held TransCanada liable for aiding and abetting breaches of the duty of disclosure. As to the sale process finding and, in particular,

---

[184] *Liability Decision*, 299 A.3d at 406.

its findings as to TransCanada's knowing participation, the court correctly bifurcated its analysis. It first addressed whether TransCanada knew that the sell-side fiduciaries were breaching their duties and was correspondingly aware that its own conduct was wrongful. It then focused on whether TransCanada culpably participated in the breach. Our analysis is sequenced accordingly.

B

In our recent decision *In re Mindbody, Inc. Stockholder Litigation*, we clarified that under the first prong of the "knowing participation" element of a claim that a buyer aided and abetted a sell-side fiduciary breach—the putative aider-and-abettor's knowledge—the plaintiff must prove "two types of knowledge."[185] First, the plaintiff must prove that the buyer knew of the sell-side breach. The plaintiff must also prove that the buyer knew that "its own conduct regarding the breach was improper."[186] Under this formulation, a buyer cannot participate in a breach of which it is unaware.

As this Court recognized in *RBC Capital Markets, LLC v. Jervis*[187] and reiterated recently in *Mindbody*, the requirement that an aider and abettor act knowingly—that is, with knowledge that the primary party's conduct constitutes a breach of fiduciary duty and that its own conduct is legally improper—"makes an

---

[185] *Mindbody*, 332 A.3d at 390.
[186] *Id.* at 392 (emphasis omitted).
[187] 129 A.3d 816 (2015).

aiding and abetting claim among the most difficult to prove."[188]  This is especially so when the claim is brought against a buyer who is alleged to have aided and abetted a breach by a sell-side fiduciary.  Indeed, as in *Mindbody*, the parties here have not cited any other cases in this jurisdiction in which a third-party buyer has been found liable for aiding and abetting a sell-side breach of fiduciary duty.  This is not surprising given the nature of the negotiation process.  In that setting, a buyer has limited visibility into the seller's internal governance dynamics.  That limitation, coupled with the buyer's fiduciary duty to its own stockholders to extract the best reasonably available price, erects a formidable obstacle to proving "knowing participation."

Here, the Court of Chancery concluded that TransCanada need not have actually known that Columbia's fiduciaries were breaching their duties if it had constructive—as opposed to actual—knowledge of the breaches.  The court similarly concluded that, as to its participation in those breaches, TransCanada need only to have had constructive knowledge that its own conduct was wrongful.  Relying on this Court's opinion in *RBC*, the court equated constructive knowledge with actions performed "knowingly, intentionally, or with reckless indifference."[189]

[188]*Mindbody*, 332 A.3d at 391 (quoting *RBC*, 129 A.3d at 865–66).
[189] *Liability Decision*, 299 A.3d at 471 (quoting *RBC*, 129 A.3d at 862).

In *RBC*, a 2015 opinion in which this Court affirmed the Court of Chancery's judgment against a corporate board's financial advisor for aiding and abetting the board's breach of fiduciary duty during the sale of the corporation, we held that, to establish the element of scienter for aiding-and-abetting claims, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper.'"[190] We likened this to a showing that the aider and abettor acted "knowingly, intentionally, or with reckless indifference,"[191] that is "with an 'illicit state of mind.'"[192]

In *Mindbody*, however, a case decided after the court's opinion in this case, we limited the aider and abettor's knowledge to "actual knowledge." The "actual knowledge" requirement is consistent with the comments to § 28 of the Restatement (Third) of Torts. According to comment c of § 28, it is not "enough to prove that the defendant should have known of the primary actor's wrongful conduct. The defendant's knowledge must be actual."[193] This requirement stands to reason: For a defendant to have actual knowledge of the wrongful nature of its own conduct, the

---

[190] *RBC*, 129 A.3d at 862 (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)). We note that *Wood v. Baum* is not an aiding-and-abetting case. *Wood* cites *Malpiede* for the proposition that, when pleading a non-exculpated claim against directors, the pleading of scienter must allege particularized facts that demonstrate that the directors had actual or constructive knowledge that their conduct was legally improper. We note further that *Malpiede* does not include constructive knowledge in its limited discussion of scienter.

[191] *Id*. (quoting *Metro Comm. Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004)). *Metro Comm*. does not mention constructive knowledge.

[192] *Id*. (quoting *In re Oracle Corp*., 867 A.2d 904, 931 (Del. Ch. 2004)).

[193] Restatement (Third) of Torts § 28, cmt. c. (Am. Law. Inst. 2020) (Oct. 2024 update).

defendant must already have actual knowledge of the underlying tortious conduct. Actual knowledge is "clear and direct knowledge."[194] Of course, circumstantial evidence—"such as the defendant's possession of documents or presence during relevant conversations"—might suffice to establish the defendant's knowledge of the underlying breach, but that knowledge must still be actual.[195]

## C

With the benefit of the *Mindbody* decision and the "actual knowledge" requirement, we turn next to a review of the conduct during the sale process that, for the Court of Chancery, evidenced TransCanada's constructive knowledge and assess whether it could support a finding of actual knowledge. We first address whether TransCanada actually knew that Skaggs and Smith were breaching their fiduciary duties to Columbia's stockholders and, after that, whether it knew that the Columbia board was breaching its duty of care by providing insufficient oversight of Skaggs and Smith.

---

[194] In *Deutsche Bank v. Nat'l Tr. Co. v. Goldfeder*, this Court recognized the distinction between actual and constructive knowledge: "Actual knowledge is defined as 'direct and clear knowledge.' Constructive knowledge is defined as 'knowledge that one using reasonable care and diligence should have, and therefore that is attributed by law to a given person.'" 2014 WL 644442, at *2 (Del. Feb. 14, 2014) (TABLE) (quoting *Knowledge,* Black's Law Dictionary 950 (9th ed. 2009). To put it differently, constructive knowledge is "impute[d]" *by law* "to a person who fails to learn something that a reasonably diligent person would have learned[,]" whereas actual knowledge is "[r]eal knowledge" that is "clear and direct." *Intel Corp. Inv. Pol'y Comm. v. Sulmya*, 589 U.S. 178, 184–85 (2020) (cleaned up).

[195] Restatement (Third) of Torts § 28, cmt. c. (Am. Law. Inst. 2020) (Oct. 2024 update).

In assessing TransCanada's knowledge of the sale-process breaches, the Court of Chancery trained its attention on Poirier. Pointing first to Poirier's considerable experience in the M&A field, the Court of Chancery then catalogued "a series of signals" from which Poirier should have realized that his negotiating counterparts—Skaggs and Smith—"were focused on selling at a defensible price and retiring with their change-in-control benefits, rather than seeking the best transaction reasonably available."[196] Those signals included: their message that there would be no social issues in the deal; their lack of interest in enforcing the Standstill; Smith's behavior during the January 7 meeting; Smith's communications with Poirier before and after each communication between Skaggs and Girling; Smith's encouragement of a bid during February 2016; Smith's reassurances that Columbia management wished to get a deal done with TransCanada; and Smith's statement, in the wake of the *Wall Street Journal* article, that Columbia's board was "freaking out" and had instructed management to get a deal done "whatever it takes."

These "signals" viewed collectively led the Court of Chancery to infer Poirier's constructive knowledge of foul play on the part of Skaggs and Smith, summing up as follows:

> Poirier . . . knew that Skaggs and Smith had powerful financial motivations to sell. They seemed to want an exit badly and kept committing unforced errors. Poirier and TransCanada had constructive knowledge that Smith and Skaggs were breaching their duty of loyalty

[196] *Liability Decision*, 299 A.3d at 476.

66

by trying to lock in their change-in-control benefits and retire. At a minimum, TransCanada knew that Skaggs and Smith were breaching their duty of care by acting like a bunch of noobs who didn't know how to play the game.[197]

That a bidder in a complex negotiation should, in the exercise of reasonable care and diligence, know—and thus possess constructive knowledge—that its sell-side counterpart's self-interest and eagerness to conclude a deal is reliable evidence of a breach of fiduciary duty is, in our estimation, a questionable proposition. Yet this, as a practical matter, is what the Court of Chancery found as a factual matter and, as such, it is, as mentioned previously, entitled to deference. But whether these same facts support a finding of actual knowledge—a finding the Court of Chancery did not make[198]—is another matter; we conclude that they do not suffice.

On this point, our analysis of the knowledge element of the plaintiffs' claim bleeds into our consideration—to be taken up later—of whether TransCanada culpably participated in the sell-side breaches. It does so because our test for determining whether a defendant substantially assisted, and thus culpably

---

[197] *Id.* at 476–77.

[198] The plaintiffs seem to contend that the Court of Chancery found that TransCanada actually knew that Skaggs, Smith, and the Columbia board were breaching their fiduciary duties. We disagree. Each statement in the court's opinion regarding TransCanada's knowledge is qualified with a reference to constructive knowledge. *See, e.g., Liability Decision*, 299 A.3d at 476 ("The plaintiffs proved that TransCanada knew that Skaggs and Smith were engaging in a breach of the duty of loyalty and that the Board was failing to provide meaningful oversight. At a minimum, TransCanada had constructive knowledge of those breaches of duty."); *id.* at 477 ("TransCanada also had constructive knowledge that the Board was breaching its duty of care.").

participated in, another's breach considers, among other things, the defendant's knowledge of the underlying breach.

In *Mindbody*, we adopted the Court of Chancery's formulation in *In re Dole Food Co., Inc. Stockholder Litigation*,[199] derived from Restatement (Second) of Torts § 876 comment d, of a list of factors that shed light on whether a secondary actor has substantially assisted the primary actor in its wrongful conduct. Those factors are:

- The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences and the secondary actor's knowledge of these aspects;

- The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

- The nature of the relationship between the secondary and primary actors; and

- The secondary actor's state of mind.[200]

We recognized that these factors provide "a helpful analytical framework for assessing substantial assistance, knowledge, and participation."[201] Indeed, the interplay of these elements is, we think, self-evident. We noted in *Mindbody*, however, that the "relevance of each factor depends on the facts of the case."[202] Here

---

[199] 2015 WL 5052215, at *41–42 (Del. Ch. Aug. 27, 2015).
[200] *Mindbody*, 332 A.3d at 395–96.
[201] *Id.* at 396.
[202] *Id.*

we confine our discussion to the factor that bears most directly on TransCanada's knowledge that Skaggs, Smith, and the Columbia board were breaching their fiduciary duties: the clarity of the breach.

In discerning the clarity of the breach, we must view the facts from the perspective of TransCanada's negotiators in "real time," that is, during the negotiations. The Court of Chancery's opinion provides helpful hints as we look back at what TransCanada knew at the relevant time.

First of all, the court found that "TransCanada did not actually know of Skaggs and Smith's plans to retire, but . . . had constructive knowledge[]"[203] from the surrounding circumstances. Although Skaggs and Smith wanted to retire with their change-in-control benefits in hand, the court also perceived that, they "*wanted* to do the right thing when selling the company,"[204] but allowed their self-interest to "undermine[] their ability to achieve the best value reasonably available for the [Columbia] stockholders."[205] Even so, "[t]he plaintiffs did not seek to prove that Skaggs and Smith were so conflicted that they would sell at any price,"[206] and the court found that they "were focused on selling at a defensible price . . . . "[207] This is consistent with the court's depiction of Skaggs and Smith in its appraisal decision as

---

[203] *Liability Decision*, 299 A.3d at 488.
[204] *Id.* at 462 (emphasis added).
[205] *Id.*
[206] *Id.*
[207] *Id.* at 496.

"professionals who took pride in their job and wanted to do the right thing."[208] That Skaggs and Smith wanted to "do the right thing" in a professional manner would have manifested itself to Poirier and TransCanada when they rejected several of TransCanada's proposals even though they were at a premium to the current Columbia share price.

Admittedly, Skaggs and Smith were eager to strike a deal, and TransCanada presented the most attractive option given their personal objectives. But given the "countervailing incentives [they had] to pursue the best deal possible"[209]—incentives the Court of Chancery recognized in its appraisal decision—and their pushing back against premium offers from TransCanada, we see Skaggs's and Smith's eagerness as sending ambiguous signals at best. An inference that such subtle and unintentional signals should arouse suspicion—much less constitute clear and direct knowledge—that a sell-side fiduciary is acting disloyally or in bad faith would not, in our view, be justifiable.

Likewise, we place less emphasis on the Court of Chancery's reliance on Skaggs's and Smith's "lack of interest in enforcing the Standstill"[210] as providing a signal that they were breaching their fiduciary duties. As set forth in the factual discussion above, neither TransCanada nor Columbia thought that TransCanada's

[208] *Id.* at 462 (quoting *Appraisal Decision*, 2019 WL 3778370, at *28).
[209] *Id.* (quoting *Appraisal Decision*, 2019 WL 3778370, at *28).
[210] *Id.* at 476.

communications violated the Standstill. To the contrary, at a critical juncture in the negotiations, TransCanada, through its counsel, exhibited its awareness of and respect for the Standstill by confirming via Columbia's counsel that an expression of interest from Girling to Skaggs would not violate the Standstill.

The breach of the duty of care by the Columbia board—a breach the Court of Chancery found was "inadvertent"—would have been even less clear to TransCanada. This conclusion is evidenced by the court's brief finding: "TransCanada also had constructive knowledge that the Board was breaching its duty of care. Although TransCanada did not have direct interaction with any Board members and was not inside the boardroom for any meetings, TransCanada saw the results."[211] While this imputation of knowledge might suffice to establish constructive knowledge, it does not support a finding that TransCanada actually knew of the board's breach.

In sum, the Court of Chancery did not find that TransCanada had actual knowledge of Skaggs's and Smith's breach of duty of loyalty or that the Columbia board was failing to maintain meaningful oversight of the sale process. And we have concluded that the record would not have supported such a finding. Absent the requisite actual knowledge of the underlying breaches, TransCanada could not know that its own conduct was legally impermissible. Put differently, lacking actual

---

[211] *Id*. at 477.

knowledge of the sell-side breaches, TransCanada could not have knowingly participated in them.[212]

D

Although we could end our inquiry with our determination that the trial record does not support a finding that TransCanada actually knew of Skaggs's, Smith's, and the Columbia board's sale-process breaches, for the sake of completeness, we review the Court of Chancery's finding that TransCanada culpably participated in the breaches.

i

Our case law justifiably views with caution aiding-and-abetting claims against potential acquirors negotiating at arm's length. The dynamic of arm's-length negotiations, in which both sides are striving for the most favorable price, should render such claims "the most difficult to prove."[213] As this Court explained in *Malpiede*,

> a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board. Similarly, a bidder may be liable to a target's stockholders for aiding and abetting

---

[212] *Mindbody*, 332 A.3d at 404 ("In assessing *scienter*, the less obvious the violation, the harder it is to find that a third-party buyer, acting at arms'-length, acted with *scienter* as to both the primary party's conduct and its own conduct.").

[213] *Id.* at 391 (quoting *RBC*, 129 A.3d at 865–66).

a fiduciary breach by the target's board where the bidder and the board conspire in or agree to the fiduciary breach.[214]

For these reasons, in *Mindbody*, we explained that, when evaluating the nature of the relationship between the secondary and primary actors, the secondary actor's status as a third-party bidder affords it "some protection in its negotiations with potential target companies and the directors and officers of those companies."[215]

We also emphasized in *Mindbody* that whether a defendant's participation in another's breach of duty is culpable hinges in large part on whether the defendant substantially assisted in the commission of the breach.[216] In the present context, the "substantial assistance" requirement, derived from § 876 of the Restatement (Second) of Torts, encompasses encouragement of or significant aid in the sell-side fiduciary's breach;[217] it requires something more than the passive observation of the seller's eagerness to strike a deal or its negotiators' want of bargaining acumen.

---

[214] *Malpiede*, 780 A.2d at 1097 (citing *Gilbert*, 490 A.2d at 1058) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.") (cleaned up).

[215] *Mindbody*, 332 A.3d at 402.

[216] *Id.* at 395–96.

[217] *See* Restatement (Second) of Torts § 876 cmt. d (Am. Law. Inst. 1979) (Oct. 2024 update); *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) (referring to "the longstanding rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of finding wrongdoing, constitute aiding and abetting" and listing two examples of conduct that might warrant the imposition of aiding-and-abetting liability: "buying off the board in a side deal, or by actively exploiting conflicts in the board to the detriment of the target's stockholders").

This means that an aider and abettor's participation in a primary actor's breach of fiduciary duty must be of an active nature. It must include something more than taking advantage of the other side's weakness and negotiating aggressively for the lowest possible price. Put another way, a bidder who has not colluded or conspired with its negotiating counterpart, who does not create the condition giving rise to a conflict of interest, who does not encourage his counterpart to disregard his fiduciary duties or substantially assist him in committing the breach, does not aid and abet the breach. The bidder may have, under such circumstances as we have seen here, stretched the bounds of hard bargaining so ungraciously as to unsettle the polite observer. But a bidder's aggressive bargaining tactics, however disquieting, do not constitute aiding and abetting unless the bidder has substantially assisted, that is, "knowingly participated" *in the* breach.

ii

According to the Court of Chancery, TransCanada's culpable participation was three-fold; it consisted of: (1) Poirier's exploitation of Smith's inexperience in negotiating the sale of a public company; (2) TransCanada's violation of its $26.00 offer; and (3) a purported threat of a harmful disclosure if Columbia did not accept TransCanada's updated $25.50/share offer.

74

The Court of Chancery found that TransCanada, acting through Poirier exploited Smith, described by the court as a "neophyte dealmaker"[218] who was out of his depth throughout the negotiations. The court found that

> Poirier skillfully cultivated Smith by trading on their past professional friendship. Then, Poirier manipulated Smith by creating the impression that the two of them were the Svengalis behind the scenes, working together as partners to pull everyone's strings, script their bosses' conversations, and generally make the deal happen. Co-opted by Poirier, Smith spoke freely, giving Poirier the information he needed to take advantage of the situation.[219]

Although the court considered Poirier's interaction with Smith in its analysis of whether TransCanada exploited the sell-side breaches, it concluded Poirier's handling of Smith did not amount to culpable participation. We agree. It cannot be the case that taking advantage of a personal relationship and superior negotiating skills and experience to secure the best reasonably available price will expose a party to aiding-and-abetting liability.[220]

iii

We turn next to the Court of Chancery's finding that TransCanada's violation of the Standstill was evidence of its culpable participation in the sellers' breaches. The court found that the Standstill breaches were "persistent and opportunistic . . .

---

[218] *Liability Decision*, 299 A.3d at 405.
[219] *Id.*
[220] *See Morgan*, 2010 WL 2803746, at *8.

over an extended period, culminating in the exploitative $25.50 Offer."[221] Of course, neither their persistence nor any edge they might have given TransCanada transforms these purported breaches into knowing participation in the sell-side breaches of fiduciary duty. We acknowledge here that, if TransCanada's conduct constituted breaches of the Standstill, it most certainly "participated" in those breaches. But for that participation to have been culpable—and here, once again, "knowledge of wrongdoing and substantial assistance of it"[222] are difficult to separate—TransCanada must have known not only that it was breaching the Standstill, but that Columbia's negotiators were, by allowing it, breaching their fiduciary duties. The record suggests that something more like the opposite is true.

Both Columbia's in-house and outside counsel believed that the Standstill permitted informal communications and only required a written invitation before TransCanada could present a formal offer.[223] This understanding was shared with TransCanada in advance of the January 7 meeting between Smith and Poirier.[224] And it was TransCanada that later proactively approached Columbia to ensure that the further actions it was taking did not—at least in Columbia's view—contravene the Standstill. Columbia's response, through its general counsel, was that an

---

[221] *Liability Decision*, 299 A.3d at 480.

[222] Restatement (Third) of Torts § 28 cmt. d (Am. Law Inst. 2020) (Oct. 2024 update).

[223] App. to Opening Br. at A841.

[224] *Id.* at A237. The parties stipulated that "[o]n January 4, 2016, counsel for Columbia and counsel for TransCanada discussed the CPG/TransCanada NDA and agreed that the parties could exchange confidential information." *Id.*

informal "offer to purchase our securities in this context would not violate or be in contravention with the terms of the NDA, including the standstill provision."[225]

Whether this understanding represented an accurate reading of the Standstill is beside the point. What is relevant is whether TransCanada knew that it was breaking the Standstill and also knew that it was thereby substantially assisting the Columbia negotiators in the breach of their fiduciary duties. In our view, in light of the parties' mutual understanding, we cannot reach such a conclusion.

iv

Even if we account for the Court of Chancery's findings regarding Poirier's exploitation of Smith's ineptitude and TransCanada's alleged Standstill breaches, those findings by the court's own admission would not suffice to support a finding that TransCanada aided and abetted the sell-side breaches of fiduciary duty. It was "by reneging on the $26 Deal, making the $25.50 Offer, and backing it up with a coercive threat that violated the NDA"[226] that TransCanada crossed the line.

TransCanada contests the Court of Chancery's factual finding that a deal at $26 per share existed. And it contends that, even if there was a deal, Poirier's statement that TransCanada would publicly disclose the end of negotiations if Columbia did not accept the $25.50 offer was not a "threat." Our review of the

---

[225] *Id.* at A841.
[226] *Liability Decision*, 299 A.3d at 480.

77

record, despite the deference we afford to the Court of Chancery's findings of fact, leads us to conclude that there was no deal at $26 on which TransCanada could have reneged and that the court's finding to the contrary does not find support in the record.[227]

After receiving the $26 offer, Columbia's board of directors did not vote to accept it at its March 10 meeting. The minutes from that meeting reveal that this was because there was not yet a firm deal that the Columbia board could vote to accept. Nor did Smith possess authority to accept an offer on Columbia's behalf. The minutes describe TransCanada's overture only as an "indicative offer[,]"[228] a term indicating that the board viewed the offer as non-binding. The minutes then describe a presentation by Smith, in which he explained that TransCanada had yet to "present [its] revised [financing] plan to the credit rating agencies" to confirm that TransCanada would maintain its current credit rating following an acquisition of Columbia.[229] Skaggs then "explained that TransCanada's offer was non-binding, being subject to changes in market conditions and TransCanada receiving feedback from the credit rating agencies and TransCanada's underwriters."[230] This statement

---

[227] *See Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 94–95 (Del. 2021) (quoting *Biolase, Inc. v. Oracle P'rs*, 97 A.3d 1029, 1035 (Del. 2014)) ("Factual findings are not clearly erroneous 'if they are sufficiently supported by the record and are the product of an orderly and logical deductive process.'").

[228] App. to Opening Br. at A810.

[229] *Id.*

[230] *Id.*

mirrored the three conditions—whether rating agencies viewed the transaction favorably, whether TransCanada's stock price remained above $49 CAD, and whether TransCanada's underwriters would support a bought deal—that Poirier had given Smith when he presented the $26-per-share offer. The minutes state that "[t]he Board recognized that TransCanada's offer was only a *non-binding* indication of interest, and there could be no certainty that it would result in a firm offer."[231] And at the end of the meeting, "the Board concluded that TransCanada's indicative offer was *a basis for moving forward* with discussions, and authorized management to continue working towards a *potential* transaction."[232]

The Court of Chancery put little weight on descriptions of the Columbia board's understanding that there was no deal at $26 per share contained in the minutes of the March 10 meeting because the minutes "were prepared retrospectively after the outcome of the sale process was known."[233] Under our deferential standard of review of factual findings, we credit the court's skepticism of the minutes. But contemporaneous evidence supports a finding that the minutes as prepared—at least with respect to the content of the March 10 meeting—were accurate. An email sent by Skaggs "about an hour" after Poirier presented the $26-per-share offer to Smith described it as an "indicative bid" and proposed that the

---

[231] *Id.* at A811 (emphasis added).
[232] *Id.* (emphasis added).
[233] *Liability Decision*, 299 A.3d at 449.

board meet on March 10.[234]  That email also noted that Columbia still needed to "develop a better sense of the offer and . . . confer with our legal/financial advisors."[235]  After Skaggs and Girling spoke on March 10, Skaggs circulated a second email to the Columbia board that contained an outline for discussion that closely matches the description of the March 10 meeting contained in the minutes. The email describes the $26-per-share transaction as an "Indicative/Provisional Proposition."[236]  In a section titled "Primary Deal Risks[,]" the email also outlines the same three considerations—TransCanada's stock price, support for a bought deal on TransCanada's equity offering, and TransCanada's credit rating—that were discussed at the meeting.[237]  The email then outlined a number of "To-Do's" in advance of a deal and contemplated that the board would not "vet the deal" and review fairness opinions until March 21 and 22.[238]  On the same day, TransCanada also sought an extended period of exclusivity, signaling that it did not believe that a deal had been reached, and its stock fell below $49 CAD per share, one of the contingencies noted during Poirier's call with Smith.

The "three strands of circumstantial evidence"[239] relied on by the Court of Chancery cannot overcome the weight of this evidence and support a finding that

---

[234] App. to Opening Br. at A873.
[235] *Id.*
[236] *Id.* at A871.
[237] *Id.*
[238] *Id.* at A871–72.
[239] *Liability Decision*, 299 A.3d at 437.

the $26-per-share offer was anything more than indicative and non-binding. First, the memo provided to the fairness opinion committee that, in the court's view, illustrated Wells Fargo's understanding that the parties had reached a firm deal at $26 states "the [TransCanada] board . . . approved the submission of a verbal offer at $26 per share" and "the [Columbia] board accepted this preliminary offer on the morning of March 10, 2016."[240] That statement is incorrect. It is an uncontested fact that the Columbia board never voted to accept the $26 offer.

Second, the court based its finding on text messages between two TransCanada executives on the day Poirier communicated the $26 offer to Smith. In particular, it relied on a text message describing the transaction as a "done deal."[241] Yet the other text messages in this chain strongly suggest that the parties were yet to reach a firm deal. One reads "[Poirier] just spoke to [Smith] and they are *thinking* about 10% equity. *They just might do it*."[242] The phrases "thinking about" and "just might do it" are evidence that TransCanada did not believe that Columbia, through Smith, had accepted the $26 offer. And the beginning of the message quoted in part by the Court of Chancery in its opinion reads "I just talked to [Poirier] and he is confident that they *will* do it. The[y] have called a Board

---

[240] *Id.* (quoting JTX 1120 at 1; App. to Opening Br. at A889) (internal quotation marks omitted).
[241] *Id.* (quoting JTX 1779; App. to Opening Br. at A855).
[242] App. to Opening Br. at A855 (emphasis added).

meeting for tomorrow morning."[243]  Again, this evidence suggests that TransCanada did not believe that Columbia had accepted the $26 offer.

Finally, the court relied on the fact that Columbia's management did not waive the other bidders' standstills on March 9 when TransCanada's exclusivity expired as instructed by the Columbia board.  But when the Columbia board again provided express direction to waive those standstills on March 11—before Poirier presented the $25.50 offer to Kettering on March 14—Columbia management promptly did so.  This supports a finding that Columbia's management did not believe there was yet a deal, and, in any case, the failure to waive the other bidders' standstills on March 9 is not sufficient to counterbalance the overwhelming evidence in the record that no deal existed at $26 per share.

Nor are we persuaded that TransCanada's subsequent $25.50 offer was accompanied by a coercive threat.  To be sure, as the plaintiffs point out, TransCanada had received an opinion letter from its outside counsel stating that a threat of disclosure "would not be a viable strategy" because such a disclosure would be prohibited by the Standstill.[244]  But it is also the case that TransCanada was under an obligation to disclose the offer under Toronto Stock Exchange rules were

---

[243] *Id.* (emphasis added).

[244] App. to Answering Br. at B15.  We note that this opinion letter addressed TransCanada's question to outside counsel whether it could gain leverage by disclosing the $26-per-share offer that it made during the November sale process to gain leverage in future negotiations, not the $26-per-share offer that TransCanada made in March.

negotiations to fail—a disclosure that the Standstill would have permitted. That TransCanada successfully bluffed Columbia through Poirier's untruthful statement to Kettering that the $25.50 offer was its "best and final offer" and thus its rejection would trigger disclosure does not make TransCanada's statement a threat that could subject it to aiding-and-abetting liability.[245] It is merely another example of hard bargaining protected by our "long-standing rule that arm's-length bargaining is privileged" and our recognition that under Delaware law, "both the bidder's board and the target's board have a duty to seek the best deal terms for their own corporations."[246]

Because the record does not support a finding that there was a $26-per-share deal on which TransCanada could have reneged and followed with a coercive offer—a finding the court believed, and that we agree, was necessary for TransCanada's conduct to "topple across the line of culpability"[247]—we conclude that TransCanada's conduct did not constitute the substantial assistance required for aiding and abetting liability to attach.

---

[245] TransCanada contests the Court of Chancery's factual finding that Poirier's statement that the $25.50 offer was "best and final" was false. Certainly, some evidence supports a finding to the contrary, but the record adequately supports the court's conclusion such that we see no reason to disturb it. *See Bäcker*, 246 A.3d at 94–95 (holding that where there are two permissible views of the evidence, we afford deference to the trial court's findings).

[246] *Morgan*, 2010 WL 2803746, at *8.

[247] *Liability Decision*, 299 A.3d at 407.

V

TransCanada next contends that the Court of Chancery erred in finding it liable for aiding-and-abetting breaches of the Columbia fiduciaries' duty of disclosure. As with the claims previously discussed, liability for aiding and abetting a disclosure breach will attach only when the defendant knowingly participated in the breach.

A

It is axiomatic that Columbia's fiduciaries were required to "disclose fully and fairly all material facts within their control"[248] bearing on their request that Columbia stockholders approve the acquisition by TransCanada. Directors of a Delaware corporation breach their fiduciary duty of disclosure when an "alleged omission or misrepresentation is material."[249] The Court of Chancery found that several misrepresentations and omissions in the Proxy fit this bill;[250] for clarity, we place them into five categories.

First, the court noted that the Proxy failed to disclose that both Skaggs and Smith were planning to retire in 2016.

Second, the court found that the Proxy omitted or mispresented a series of interactions between TransCanada and Columbia management that were

---

[248] *See Dohmen*, 234 A.3d at 1168.
[249] *Id.*
[250] *See Liability Decision*, 299 A.3d at 448–49, 485–87.

"sufficiently extensive [so as] to alter the total mix of information."[251] In particular, the court found that the Proxy either did not mention or provided inadequate or misleading descriptions of:

- The November 25 meeting during which Smith told Poirier that Columbia would "probably" continue the sales process "in a few months."[252]

- The December 2 call between Skaggs and Girling, as well as another call that day between Fornell and Smith, after which Fornell provided Poirier with a proposed engagement letter for Wells Fargo to act as a financial adviser to TransCanada in its potential acquisition of Columbia.

- The December 8 meeting between Fornell, Skaggs, and Smith at the energy conference.

- The December 17 call between Poirier and Smith, during which Poirier indicated that TransCanada would be willing to pay $28 per share.

- The January 4 call between Poirier and Smith. The Proxy stated that the purpose of the call was to request a meeting, which the court found to be misleading because the January 7 meeting had been scheduled since mid-December.

- The January 7 meeting during which Poirier again indicated that TransCanada could be willing to pay $28 per share, and Smith told Poirier that TransCanada would be unlikely to face competition.

- The February 9 meeting between Smith, Skaggs, and Fornell during which they discussed the potential acquisition. The Proxy only disclosed that

---

[251] *Id.* at 486.
[252] *Id.*

discussions had taken place from February 8 through February 12, which the court considered to be too "vague."[253]

In the court's view, the Proxy's omissions and mischaracterizations of these interactions "painted a misleading picture of the nature and extent of the contacts between TransCanada and the Columbia management team."[254]

Third, the court found that the Proxy failed to disclose that TransCanada had repeatedly violated the Standstill. Specifically, the court noted that the Proxy failed to disclose that, from November 2015 to March 2016, "TransCanada's contacts with Columbia breached the Standstill, that Columbia management chose not to enforce the Standstill, and that Columbia management did not bring those breaches to the attention of the Board so that the Board could determine how to proceed."[255] The court held that omitting this information materially altered the total mix of information because it prevented stockholders "from understanding how receptive Columbia management was to TransCanada's approaches."[256]

Fourth, the court found that the Proxy failed to disclose that the other bidders were bound by standstills. The court noted that, although the Proxy had disclosed that Columbia executed NDAs with three other bidders[257] in November 2015, it did

---

[253] *Id.* at 487.
[254] *Id.*
[255] *Id.*
[256] *Id.*
[257] Those bidders were Dominion, NextEra, and Berkshire.

not explicitly mention the "don't-ask-don't-waive" feature of the standstills.  Rather, the Proxy disclosed that "none of [the other potential acquirors] would be subject to standstill obligations that would prohibit them from making an unsolicited proposal to the Board" after Columbia had announced the merger.[258]  The court also found that the Proxy misleadingly disclosed that "[u]nlike TransCanada, none of [the other potential acquirors] sought to re-engage in discussions with [Columbia] after discussions were terminated in November 2015."[259]  According to the court, "[t]he failure to disclose the true nature of the other bidders' standstill obligations was materially false and misleading."[260]

Finally, the court found that the Proxy mischaracterized the $26 proposal.  The Proxy described it as "an indicative offer."[261]  In the court's view, this was a "partial and misleading description of the $26 Offer" because "Columbia's officers accepted the $26 Offer, resulting in the $26 Deal."[262]  In the court's view, even though TransCanada's offer came with three conditions, that still made it "a real offer."[263]

Having concluded that the disclosures in the Proxy were inadequate, the court turned to the question whether TransCanada had aided-and-abetted these breaches, again with an emphasis on the requirement that an aider-and-abettor "knowingly

---

[258] *Liability Decision*, 299 A.3d at 448.
[259] *Id.*
[260] *Id.*
[261] App. to Opening Br. at A1041.
[262] *Liability Decision*, 299 A.3d at 487.
[263] *Id.*

participate" in the breach. In concluding that TransCanada had knowingly participated in the disclosure breaches, the court relied on the Court of Chancery's decision in *Mindbody* for the proposition that "an acquirer knowingly participates in a disclosure violation when the acquiror has the opportunity to review a proxy statement, has an obligation to identify material misstatements or omissions in the proxy statement, and fails to identify those misstatements or omissions."[264] And TransCanada had agreed in the Merger Agreement to provide all material information necessary to be included in the Proxy, and to "promptly notify" all other parties should it discover that the Proxy required amendment to ensure that it did not "contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein . . . not misleading."[265] The court found that TransCanada's failure to identify known or suspected deficiencies in the Proxy despite this contractual obligation was knowing participation sufficient to support its conclusion that TransCanada was liable as an aider-and-abettor.

B

TransCanada does not contest the Court of Chancery's conclusion that, as a result of the omissions and partial disclosures described above, Smith, Skaggs, and

---

[264] *Id.* at 487–88 (citing *In re Mindbody, Inc.*, 2023 WL 2518149, at *43–44 (Del. Ch. Mar. 15, 2023), *rev'd in part*, 332 A.3d 349 (Del. 2024)).
[265] App. to Opening Br. at A947–48.

the Columbia board breached their fiduciary duty of disclosure. It instead takes aim once more at the court's conclusion that TransCanada "knowingly participated" in those breaches. Accordingly, our analysis is again focused only on the third element of our aiding and abetting framework; that is, whether TransCanada "knowingly participated"[266] in the Columbia management and board's breaches of the duty of disclosure.

As noted earlier, the Court of Chancery reached its conclusion here without the guidance of our opinion in *Mindbody*.[267] In *Mindbody*, we addressed the circumstances under which a buyer's breach of a contractual duty to correct a seller's proxy materials might give rise to aiding-and-abetting liability. We held that where a buyer fails to act in the face of an affirmative contractual obligation, such "contractual provision [does] not transform [the buyer's] inaction into a 'knowing participation'" in the Seller's disclosure breach.[268] The contractual provision at issue in *Mindbody*, like Section 5.01 of the Merger Agreement here, created an affirmative obligation on the part of the buyer to notify the seller of any material misstatements in the proxy statement. Our analysis of a claim that a buyer aided-and-abetted disclosure breaches by a seller, however, is not a question of whether the buyer

---

[266] *Malpiede*, 780 A.2d at 1098.
[267] The Court of Chancery's decision in *Mindbody* was issued in March 2023. The *Liability Decision* was issued in June 2023. We issued our opinion in *Mindbody* in December 2024.
[268] *Mindbody*, 332 A.3d at 390.

breached its contractual obligation alone. Instead, we evaluate whether the buyer's conduct constitutes "substantial assistance" in the seller's disclosure breaches.[269] "Substantial assistance" in this context extends beyond "passive awareness of a fiduciary's disclosure breach that would come from simply reviewing draft Proxy Materials."[270] In *Mindbody*, we declined to find the buyer liable for aiding and abetting the seller's disclosure breaches where the buyer took no affirmative action to assist the seller's breach—even though the buyer had undertaken an affirmative contractual obligation to notify the seller of factual deficiencies in a proxy statement. An application of the facts of this case to the factors discussed in *Mindbody* and above dictates the same outcome.

C

As mentioned above, the *Mindbody* factors encompass both the "knowledge" and "culpable participation" necessary for aiding-and-abetting liability to attach. And as also mentioned above, an aider-and-abettor's knowledge of the fiduciary breach in question and of the wrongfulness of its own conduct, must be actual knowledge. Again, we review these factors in turn. Like in *Mindbody*, all four factors are relevant to the disclosure claim.

---

[269] *Id.*
[270] *Id.*

90

The first factor, as we said earlier, concerns "the nature of the tortious act, as well as its severity, the clarity of the violation, the extent of the consequences, and the secondary actors' knowledge of these aspects."[271]  This, we have held, is an analysis of "whether [the buyer] acted 'with the knowledge that the conduct advocated or assisted constitutes [a disclosure] breach."[272]  As was the case in *Mindbody*, each disclosure breach found by the Court of Chancery is "not of equal weight[,]"[273] but the record shows that at least some of the disclosure breaches were of a *severity* and *clarity* that weigh in favor of a finding of liability.

TransCanada had actual knowledge of some deficiencies in the Proxy.  For one, the court found that TransCanada had actual knowledge of the content of each of the meetings between each counterparty's senior management.  Upon review of the Proxy by TransCanada's management and outside counsel, TransCanada gained actual knowledge that the Proxy's characterization of these meetings was either misleading, inadequate, or non-existent.  It is true, as TransCanada points out, the Proxy did not need to provide a "a 'play-by-play' recitation"[274] of the sale process.  But the descriptions of certain meetings, especially those in December 2015 and

---

[271] *Id.* at 395–96.
[272] *Id.* at 396 (quoting *Malpiede*, 780 A.2d at 1097).
[273] *Id.*
[274] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008).

January 2016, presented a warped image of the sale process that elided numerous interactions, in particular between Smith and Poirier, that showed that TransCanada had long been Columbia management's preferred acquiror. Specifically, there was no mention in the Proxy of any contact between Smith and Poirier in December 2015, and the description of the January 4, 2016 call was misleadingly written in order to account for these omissions.[275] TransCanada had also been informed by Smith at the January 7 meeting, but the Proxy did not disclose, that TransCanada was unlikely to face competition. These omissions were material, readily apparent to TransCanada upon review of the Proxy, and support a finding of knowledge.

The court also found that TransCanada knew that the reasons disclosed in the Proxy for TransCanada's decision to renege on the $26-per-share offer given by Poirier were largely pretextual, and that, had Columbia countered, TransCanada could have maintained a deal above $25.50 per share. This breach would have been less clear to TransCanada. Though TransCanada had actual knowledge that the reasons for reneging on the $26 offer given to Columbia were part of a bluff, it was under no obligation to urge Columbia's management and board to "self-flagellat[e]."[276] In other words, TransCanada had no reason to know that it should

---

[275] *See Liability Decision*, 299 A.3d at 486.

[276] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).

be disclosed to Columbia stockholders that TransCanada had successfully bluffed Columbia in the final phase of negotiations.

For other omissions and deficiencies, the Court of Chancery found that TransCanada lacked actual knowledge that such disclosures were necessary. For example, TransCanada "did not actually know of Skaggs and Smith's plans" to retire in 2016.[277] Further, TransCanada only had "constructive knowledge of the Proxy Statement's failure to disclose that other bidders from the November 2015 process were bound by don't-ask-don't-waive standstills."[278] Because TransCanada lacked the required actual knowledge of these breaches, they provide no support for a finding of aiding-and-abetting liability.

On this record we are also hard pressed to find that Columbia's failure to disclose breaches of the Standstill in the Proxy would have been, from TransCanada's vantage point, a clear breach of the duty of disclosure by Columbia's fiduciaries. On more than one occasion, TransCanada's counsel had sought confirmation from Columbia that the discussions taking place between each party's executives would not contravene the Standstill. Columbia, after consulting with outside counsel, confirmed to TransCanada that it did not believe any such breach would occur. Moreover, because TransCanada had little insight into the decision-

---

[277] *Liability Decision*, 299 A.3d at 488.
[278] *Id.*

making of the Columbia board, it could not know whether the board had waived the Standstill in the interest of securing a deal. Whether the advice provided by Columbia's outside counsel, and subsequently forwarded to TransCanada, was correct is again beside the point. Our concern is whether the Proxy's failure to disclose that TransCanada's advances might have breached the Standstill was a breach of the duty of disclosure that would have been clear to TransCanada. Viewed in the light of the advice given to TransCanada through Columbia's counsel that its conduct was permissible, the Proxy's failure to disclose the Standstill breaches would not have appeared to TransCanada as a clear breach of the duty of disclosure.

In short, at least some of the breaches of the duty of disclosure by Columbia's management and board were known to TransCanada such that this factor weighs in favor of a finding of liability.

ii

The next factor *Mindbody* instructs us to consider is whether TransCanada culpably participated in the disclosure breaches. Specifically, we evaluate "the amount, kind, and duration of assistance given" by TransCanada, "including how directly involved [TransCanada] was in the primary actor's conduct."[279] We see no meaningful difference between the facts of this case and those in *Mindbody* and conclude that this factor weighs against a finding of liability.

---

[279] *Mindbody*, 332 A.3d at 396.

The Court of Chancery found that "TransCanada had reviewed the Proxy [] in detail."[280] Poirier testified at trial that "[t]here was an exchange of drafts between both companies to verify [the Proxy's] completeness and accuracy."[281] Poirier read the Proxy and provided comments on both the preliminary and definitive versions, and Girling, Johnston, Fornell, and TransCanada's outside counsel also reviewed it. Yet TransCanada did not correct any material misstatements and omissions in the Proxy. This, in the court's opinion, was because "Girling viewed the Proxy [] as Columbia's document and told his team not to worry about it."[282] According to the court, TransCanada's failure to notify Columbia about the Proxy's material misstatements and omissions, in light of its affirmative obligation to do so in Section 5.01(b) of the Merger Agreement, constituted culpable participation in the disclosure breach sufficient to trigger aiding-and-abetting liability.

We explained in *Mindbody* that "a failure to act, without some kind of active role, [does not] constitute[] 'substantial assistance' for aiding and abetting a fiduciary breach."[283] We also emphasized that the buyer in *Mindbody* did not create an "informational vacuum" that would "proximately cause [the seller's] disclosure breach."[284] In the absence of affirmative conduct and because the seller "knew

---

[280] *Id.* at 488.
[281] *Id.*
[282] *Id.*
[283] *Id.* at 401.
[284] *Id.*

everything that [the buyer] knew[,]"[285] we concluded that this factor weighted against a finding of aiding-and-abetting liability.

The same is true here. The record shows that, although TransCanada, through its management and outside counsel, offered comments on the Proxy, it did not propose any of the statements that the Court of Chancery found to be misleading. Nor did it suggest omitting material information from the Proxy. The record further shows that Columbia knew everything that TransCanada knew, with one exception. Both knew what occurred during the meetings that were not mentioned in the Proxy. Columbia also knew of the standstill agreements signed by every potential acquiror and TransCanada's approaches before the Columbia board provided written consent under the terms of TransCanada's Standstill. The plaintiffs point out that Columbia was not aware of the true reasons for TransCanada's decision to withdraw the $26-per-share offer, but as discussed above, we are unconvinced that the parties believed that there was a deal at $26 that would make such a correction necessary.

The plaintiffs contend that this case is distinguishable from *Mindbody*. According to the plaintiffs, Section 5.01 of the Merger Agreement here imposed a more demanding disclosure requirement than in *Mindbody*. The merger agreement in *Mindbody*, the plaintiffs claim, only required the buyer to provide information that the seller reasonably requested for inclusion in the proxy. Here, the plaintiffs

---

[285] *Id.*

96

insist that the Proxy "imposed an independent obligation on TransCanada to provide all information required so that the Proxy would not be materially omissive or misleading."[286]  In the plaintiffs' view, TransCanada's "conscious decision to withhold material information from the Proxy" is evidence of TransCanada's participation in facilitating the underlying fiduciary breaches.[287]

We disagree.  We can discern no meaningful difference between the Merger Agreement here and the merger agreement at issue in *Mindbody*.  Both agreements required the seller to provide the buyer with a "reasonable opportunity" to review and comment on the draft proxy statements, and both required that the buyer "promptly notify" the seller if it "discovered" "any information" required to ensure that the proxy does not contain any untrue or misleading statements.[288]

On this record, this factor weighs against a finding of liability.

### iii

The third factor from *Mindbody* concerns "the nature of the relationship" between Columbia and TransCanada.[289]  Our analysis of this factor does not differ from our approach to it in our earlier review of the sale-process claim.  And for the same reasons, we conclude that this factor weighs against liability.[290]

---

[286] Pls.' Suppl. Br. at 25 (emphasis omitted).
[287] *Id.* at 26.
[288] *Compare* App. to Opening Br. at A948 (Merger Agreement § 5.01(b)), with *Mindbody*, 332 A.3d at 398 (quoting merger agreement).
[289] *Mindbody*, 332 A.3d at 396.
[290] *See* p.72–73, *supra*.

The final factor for our consideration is TransCanada's state of mind. As we explained in *Mindbody*, our review here concerns the second scienter requirement—that the aider and abettor have actual knowledge that its own conduct was legally improper.

As was the case in *Mindbody*, the Court of Chancery did not find as a factual matter that TransCanada "knew that its failure to abide by its contractual duty to notify [Columbia] of potential material omissions in the Proxy Materials was wrongful and that its failure to act could subject it to [aiding-and-abetting] liability."[291] In *Mindbody*, we found that this factor weighed against the imposition of liability even though two members of the buyer's deal team had acted in concert to conceal details of the sale process by altering internal memoranda to remove descriptions of nearly four months of preliminary meetings with the target company's CEO.[292] We held that "the knowledge that matters for the second prong of *scienter* is knowledge that the aider and abettor's *own* conduct wrongfully assisted the primary violator in his disclosure breach."[293]

The Court of Chancery did not find that TransCanada had knowledge that, by declining to abide by its contractual duty to correct the Proxy, it was wrongfully

---

[291] *Mindbody*, 332 A.3d at 406.
[292] *Id.* at 404–06.
[293] *Id.* at 406.

contributing to a breach of duty by Columbia's fiduciaries. The record would not support such a finding. Indeed, the plaintiffs' supplemental briefing addressing this factor merely states what we have already concluded above—that TransCanada had actual knowledge, with respect to certain disclosures in the Proxy, that Columbia's fiduciaries had breached their duty of disclosure—and adds that "TransCanada recklessly chose not to correct the Proxy" despite this knowledge.[294] Plaintiffs do not cite, nor could we find, facts in the record showing that TransCanada knew that a failure to correct the Proxy was wrongful, not as a breach of contract, but as conduct that affirmatively aided breaches of Skaggs's, Smith's and the Columbia board's fiduciary duties. This factor weighs against the imposition of aiding-and-abetting liability.

Considering these factors in a holistic fashion as *Mindbody* requires, we conclude that the record does not contain sufficient support for a determination that TransCanada "knowingly participated" in any of the disclosure breaches found by the Court of Chancery. Lacking this crucial element, the plaintiffs' claim that TransCanada is partially liable for these breaches as an aider and abettor fails.

---

[294] Pls.' Suppl. Br. at 26.

## VI

For the reasons set forth above, we reverse the Court of Chancery's judgment.[295]

---

[295] Because we reverse the Court of Chancery's liability determinations, we need not address TransCanada's challenges to the court's damages rulings.